**13-0063SAG** to **13-0079SAG**

FILED
LODGED
RECEIVED

FEB - 6 2013

AT BALTIMORE COURT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND  DEPUTY

BY

# AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

This affidavit is submitted in support of an application for search warrants for 17 locations.

These location to be searched are the residences, and businesses of individuals who are active

members of a controlled substance organization operating in various locations in Maryland, New

Jersey, California, Texas and elsewhere. This group has been and will continue to be engaged on a

daily basis with distribution of large amounts (totaling more than 1000 kilograms) of marijuana,

diverted pharmaceuticals, steroids, cocaine, and other controlled substances. For reasons presented

in detail below, your affiant believes that members of this conspiracy keep and conceal in these

locations documents, records and other evidence revealing the scope of the conspiracy, the

members, the method of operation to include the laundering of proceeds from drug trafficking

through front and otherwise legitimate business entities also operated by these conspirators.

This Affidavit first sets forth your affiant's background, training, expertise, and knowledge.

(Part I). This Affidavit then describes the investigation to date conducted by law enforcement on

this group of drug traffickers, summarizing information derived so far from multiple confidential

sources, fixed and mobile physical surveillances, seizures of drugs and cash, analysis of bank

records and public documents, and hundreds of intercepted telephone calls. (Part II). This Affidavit

then identifies each of the locations to be search. For each location, this Affidavit sets forth (a) a

physical description of the location; (b) the identity of the individual(s) who lives or works at the

specified location; (c) the evidence of that individual's participation in this drug organization; (d) the

evidence that they currently live at that location; and (e) evidence that supports a search of the

location in question. (Part III).

13-0063SAG to 13-0079SAG

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

## TABLE OF CONTENTS

I. AFFIANT'S EXPERTISE AND KNOWLEDGE ................................................................ 4

II. STATEMENT OF FACTS AND CIRCUMSTANCES ..................................................... 10

III. LOCATIONS TO BE SEARCHED ............................................................................. 22

    1.    2437 Cheyenne Drive
            Gambrills Maryland 21054 ........................................... 22

    2.    1305 Hillcrest Road
            Glen Burnie, Maryland 21061 ..................................... 26

    3.    1716 Maco Drive
            Hanover, Maryland 21076 ............................................ 26

    4.    8250-D Preston Court
            Jessup, Maryland 20794 ............................................... 30

    5.    3435 Liberty Gardens Road
            Randallstown, Maryland 21244 ................................... 32

    6.    1175 Gator Court
            Arnold, Maryland 21012 .............................................. 35

    7.    2653 Didelphis Drive
            Odenton, Maryland 21113 ............................................ 38

    8.    104 Wheeler Avenue
            Baltimore, Maryland 21223 ......................................... 40

    9.    14 Church Lane
            Baltimore, Maryland 21208 ......................................... 40

    10.    1910 Towne Centre Boulevard, Unit 924
            Annapolis, Maryland 21401 ......................................... 44

    11.    2039 Industrial Drive
            Annapolis, Maryland 21401 ......................................... 44

13-0063SAG to 13-0079SAG

12.   2054 Tilghman Drive
      Crofton, Maryland 21114 ................................................................ 49

13.   326 Woodleaf Court
       Glen Burnie, Maryland 21061 ................................................... 51

14.    9-C Central Avenue
      Glen Burnie, Maryland 21060 ................................................... 51

15.   621 Genessee Street
      Annapolis, Maryland  21401 ...................................................... 54

16.   508 Royal Street
      Annapolis, Maryland 21401 ........................................................ 54

17.   1413 Mariner Drive
      Arnold, Maryland 21012 .............................................................. 58

IV. CONCLUSION .................................................................................. 60

V. ATTACHMENTS

      ATTACHMENT A

      ATTACHMENT B

      ATTACHMENT C

3

13-0063SAG -to 13-0079SAG

## I. AFFIANT'S EXPERTISE AND KNOWLEDGE.

Your affiant, Detective Matthew Wires, Anne Arundel County Police, deposes and states:

1. I am an investigative or law enforcement officer within the meaning of Section 2510 (7) of Title 18, United States Code; that is a federally deputized officer for the Drug Enforcement Administration in this investigation, who is empowered by law to conduct investigations of and/or make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am a duly constituted member of the Anne Arundel County Police since 2005. I completed the Maryland Transportation Authority Police training academy in 2001, during which time I received training in the field of drug recognition, identification, packaging, and report writing. I completed the Anne Arundel County Police lateral academy in 2005, receiving refresher training in the fields of drug recognition, identification, packaging, and report writing. I have been a detective for more than three years in the Anne Arundel County Police Special Enforcement Section, Major Offenders Unit. Prior to that, in my seven years of uniformed patrol, I have been a primary case agent as well as assisted in the seizure of vehicles and money in drug related cases. As a detective, I have made or assisted in numerous criminal arrests related to possession and distribution of several types of paraphernalia and controlled dangerous substances to include methamphetamine, marihuana, cocaine, heroin, Oxycontin, and Methylenedioxy-Methamphetamine (MDMA, more commonly known as Ecstacy). I have been the affiant or co-affiant on numerous search warrants of residences that resulted in the seizure of illegal drugs, weapons and money. I have received in-service training to include several drug and law enforcement classes. These classes include: 40-hour Drug Identification Course, 24-hour Drug Traffic Interdiction Course, 24-hour Interview Techniques Course, 8-hour Methamphetamine Lab Awareness Course, 40-hour Narcotics Investigation Course, 16-hour Cannabis Indoor Grow Course, 24-hour Techniques for Financial

4

Investigations Course, 24-hour Domestic Drug Interdiction Course, 40-hour Clandestine Laboratory Course, and 48-hour Maryland Top Gun Drug Investigator Course.

3. As a law enforcement officer, and most specifically in the Special Enforcement Section, I have participated in numerous investigations of unlawful drug distribution involving the use of confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, investigative interviews, the execution of search warrants, and the recovery of substantial quantities of narcotics, narcotics proceeds, and narcotics paraphernalia. I have reviewed taped conversations, as well as documents and other records relating to narcotics trafficking and money laundering. I have examined records consisting in part of buyers and seller's lists, and pay/owe ledgers. I have interviewed drug dealers, users and confidential informants and have discussed with them the lifestyles, appearance and habits of drug dealers and users. Through training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers collect, store and conceal the proceeds of their illegal activities. I have also become familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

4. I respectfully submit that there is probable cause to believe that violations of Title 21 U.S.C. § 841 *et seq*, Title 18 U.S.C. § 1956 *et seq*, and other violations have been committed, are being committed, and will continue to be committed by persons who are the subjects of this investigation, including, KEREM DAYI (known as Kenny Dayi), SCOTT SEGAL, PATRICK RUSSO, RANDY GLICKMAN, and others more fully described below.

5

5.     This investigation is being conducted by the Anne Arundel County Police, the Howard County Police Department, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms and Explosives, Department of Homeland Security - HSI, the Internal Revenue Service and the U.S. Postal Inspection Service. Your affiant has personally participated in this investigation as the case agent and makes this affidavit based on my personal participation in this investigation, reports made to your affiant by other law enforcement agents, telephone records, a review of consensually-recorded conversations, a review of evidence documents obtained during this investigation, debriefings of confidential informants, and approximately five months of Court Authorized wire interceptions on at least six different telephones. Except where otherwise noted, the information set forth in this affidavit was provided to your affiant by other law enforcement agents who have assisted in the investigation.  Unless otherwise noted, wherever in this affidavit your affiant asserts a statement was made, the statement was made by another law enforcement officer (any of whom may have had either direct or hearsay knowledge of that statement) to whom your affiant or other law enforcement officers have spoken or whose reports your affiant has read and reviewed.  Such statements are reported in substance and in part, unless otherwise indicated. Likewise, information resulting from surveillance sets forth either your affiant's personal observations or information provided directly or indirectly through other law enforcement officers who conducted such surveillance.

6.  Your affiant has gained extensive experience in the present investigation, being the case agent involved with nearly all aspects of this case and  investigative tasks including, but not limited to, reviewing the electronic intercepts since September of 2012.   Your affiant has learned about the illegal activities in which this conspiracy is engaged, including unlawful drug distribution, money laundering and other violations to include structuring, tax evasion, and insurance fraud. Your affiant

6

has also participated or observed the various methods of operation employed by law enforcement in this case including the use of confidential informants, undercover meetings, physical and electronic surveillances, telephone toll analysis, investigative interviews, recoveries of drugs and cash, and other evidence.

7. Based upon my training and experience and my participation in this investigation, as well as my conversations with other agents, I know that controlled substances, paraphernalia for packaging, cutting, weighing, and distributing controlled and dangerous substances, including but not limited to scales, baggies, bottles, and cans, and any and all items which are evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846: and numerous categories of financial records (bank records, investment records, charge card records, records of income and expenditures, and computer records, etc.) may be evidence of criminal violations as described and may also be evidence of the manner and means for the disposition of this illegal income. Individuals engage in money laundering to spend or invest the illegal income in such a way that they can later show certain financial records to explain their acquisition of assets and their lifestyle, and make it appear that they have not had access to the illegal income. To do so, they must keep selected records of at least some of those transactions. Therefore, I have reason to believe that:

> a. Those involved in such illegal activities and their associates often place assets in names other than their own to avoid detection of these assets by government and law enforcement agencies.

> b. Those involved in such illegal activities and their associates often place assets in the names of relatives, friends or business entities as nominee title holders in order to avoid detection of these assets by government and law enforcement agencies.

> c. Even though assets are placed in the names of other persons or entities, those involved in such illegal activities and their associates actually own

7

them.

        d.      It is common for those involved in such illegal activities and their associates to maintain in their residence and/or business establishments computerized or written books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders, and other papers relating to the illegal activities and the assets derived from the proceeds of such illegal activities.

        e.      Those involved in such illegal activities and their associates often accrue debts to or from their associates, and must therefore keep records of these transactions readily available to settle debts to or from their associates.

        f.      Those involved in such illegal activities and their associates commonly conceal proceeds of illegal transactions, records of these transactions, and records reflecting names, nicknames, addresses, and telephone numbers of criminal associates within their residence and/or place of business, their business vehicles, or the curtilage of their residence or business for ready access and to hide them from law enforcement agencies. Those involved in such illegal activities and their associates will often conceal these things within the homes of their family members.

        g.      Those involved in such illegal activities and their associates commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past associates. Those involved in such illegal activities and their associates who are aware of an ongoing criminal investigation into their illegal activities will usually alter their operational methods in order to hinder law enforcement agencies from detecting their unlawful activities. They will often destroy an existing format of records reflecting their illegal transactions (i.e., names of associates to whom they have given money and amounts of money possibly owed and/or collected). However, it is common for them to create another type of record after destroying one type of record to assist in the collection of debts.

        h.      Those involved in such illegal activities and their associates will often establish a business and use it to facilitate illegal activities, the laundering of illegal proceeds, and the collection of illegal debts. Business locations are frequently used to store records and/or receipts reflecting the collection of illegal debts and the expenditure of illegal proceeds for personal and/or business assets.

        i.      Those involved in such illegal activities and their associates will commonly conceal within their vehicles, residence, or businesses, or within the curtilage of their residence or businesses, financial instruments, precious metals, precious gemstones, jewelry, electronic equipment, cash, and other items of value and/or proceeds of illegal transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending money made in illegal activities. Those involved in such illegal activities and their associates will often conceal these things within the homes of their family members.

j.     Those involved in such illegal activities and their associates will attempt to legitimize the profits from illegal transactions by using domestic banks and their attendant services (i.e., safe deposit boxes, letters of credit, brokerage houses, real estate, shell corporations, and business fronts).

k.     Those involved in such illegal activities and their associates who are aware of a criminal investigation into their financial activities will conceal, liquidate, and transfer easily movable illegally-derived assets in order to prevent law enforcement agencies from seizing and forfeiting these assets.

l.     Those involved in such illegal activities and their associates often keep photographs or video movies of themselves, their co-conspirators, and the property and assets purchased with illegal proceeds at their residence and/or place of business.

m.     The vehicles, residence or business locations of those involved in such illegal activities and their associates will often contain records of travel related to or financed by the illegal activities, these records may include airline tickets, credit card receipts, rental care receipts, and luggage tags reflecting points of travel.

n.     Courts have recognized that an unexplained increase in wealth is probative evidence of crimes motivated by greed; all financial records of a suspect of such crimes are relevant to an analysis of the suspect's assets, income, and expenditures at various time periods, and to the money laundering of illegal income. The principal purpose of money laundering is to acquire ostensibly legitimate assets and wealth, for which the individual can produce records which appear to show that the wealth is legitimate. Any such records of ostensibly legitimate assets and income are likely to contain evidence of the money laundering, especially discrepancies between income, expenses, and growth in assets. Financial statements and loan applications often are more accurate than a criminal's filed income tax returns.

8. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for a warrant to search the identified premises for evidence of narcotics trafficking and money laundering, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this Affidavit is based upon my personal knowledge, my review of

9

**13-0063SAG  to  13-0079SAG**

documents and other evidence, and my conversations with other law enforcement officers and other

individuals. All conversations and statements described in this Affidavit are related in substance

and in part unless otherwise indicated.

## II. STATEMENT OF FACTS AND CIRCUMSTANCES

9. As a result of my personal participation in the investigation and my review of the

sources of information detailed above, your affiant states that there is a drug trafficking organization

operating in Anne Arundel and Howard Counties, Maryland. The Anne Arundel County Police, the

Howard County Police Department, the Drug Enforcement Administration, the Bureau of Alcohol,

Tobacco, Firearms and Explosives, Department of Homeland Security - HSI, the Internal Revenue

Service and the U.S. Postal Inspection Service are jointly conducting this investigation. This

investigation which began in January of 2012, has gathered evidence from confidential sources of

information, controlled purchases of drugs, search warrants, fixed and mobile surveillance, public

document checks, postal seizures, vehicle stops, ping and GPS orders on telephones and vehicles

respectively, DNR analysis, consensual and Court Authorized wiretaps, bank records and other

investigative methods.

**A. Early Investigation and Confidential Sources of Information.**

10. On January 7, 2012, a man identified as FREDERICK THOMAS, was in a single car

accident westbound on Route 100 at Quarterfield Road in Anne Arundel County, Maryland. Inside

of his car, agents discovered a shrink-wrapped package of marijuana (590 grams), a money

counting machine, a talley sheet, and 126 bank money bands (for $2,000).[1]  THOMAS described a

---

[1] Names included in this affidavit in CAPITAL LETTERS, signifies defendants in an indictment
returned on January 10, 2013 by the grand jury sitting in the District of Maryland. That
indicment is Criminal No.JKB-13-0012 and is under seal pending the execution of search
warrants. Your affiant will seek Criminal Complaints on Lineberry, Small and Goodman.

large scale marijuana distribution organization in which he was involved. According to THOMAS, this group gets marijuana from California and New Jersey, and stores the drugs in a home in Glen Burnie until the drugs are distributed. THOMAS identified "Scotty," as the main wholesale distributer in Anne Arundel County, Maryland, who receives 50 pound shipments of marijuana at a time. THOMAS identified a photograph of "Scotty," more fully identified as SCOTT SEGAL. THOMAS described receiving five to twenty pounds of marijuana at a time, directly from SEGAL. THOMAS advised that SEGAL's source of supply was a guy named "Kenny." THOMAS advised that "Kenny" was number three in the organization, and that numbers one and two were located in New Jersey. THOMAS identified a photograph of "Kenny," more fully identified as KEREM DAYI. THOMAS advised that he had been to DAYI's home at **2437 Cheyenne Drive, Gambrills, Maryland 21054 (location #1)** during January of 2012 and had vacuum sealed $150,000 in cash for DAYI. THOMAS explained that he worked at the direction of SEGAL and DAYI. DAYI once requested that THOMAS provide homes that could be used to receive parcels of marijuana that THOMAS could then collect when SEGAL was out of town. THOMAS said the members of the group change their telephone numbers regularly. THOMAS said SAE HWANG also got marijuana from SEGAL, but HWANG mainly transported the money.

11. THOMAS also described a location in Howard County, Maryland where the organization maintains a business. This business conducts EBay sales over the internet (through a business known as "202 Big Wheels"), and also uses the Howard County location for distribution of marijuana. THOMAS said the business was used as a front for marijuana distribution and the laundering of the proceeds. THOMAS described MARTIN DANDY as a five pound marijuana customer who works at the business location. THOMAS has assisted this group in the distribution of marijuana and in the handling of the cash proceeds. THOMAS advised that marijuana gets to

11

Maryland by parcel delivery, and the cash returns to California by courier or by bank deposits. In early April of 2012, THOMAS advised that DAYI cut ties with New Jersey which made DAYI number one in the organization. SEGAL was number two, and THOMAS was number three. THOMAS also advised that DAYI has family in San Francisco, California, with ties to marijuana growers. SEGAL handles the marijuana for DAYI when it arrives in Maryland. The last time your affiant spoke with THOMAS was in April of 2012. At that time, THOMAS advised that the organization was working toward receiving shipments of marijuana in Maryland of up to 250 pounds at a time.

12. Between January and late April, 2012, THOMAS provided information that your affiant believes was never untrue, but not complete. For example, he never mentioned ANTHONY SANTOIEMMA, even though a pen register on SANTOIEMMA's telephone reflected hundreds of contacts between THOMAS and SANTOIEMMA. Same for another member, RYAN WHEELER. THOMAS and WHEELER were in telephonic contact, but THOMAS never mentioned him. THOMAS did provide information about meetings, and made a controlled purchase of marijuana from SEGAL at your affiant's direction. THOMAS stopped calling your affiant in April of 2012. Based upon the below-described investigation leading your affiant to believe that THOMAS was, and still is, involved in the illegal activities described herein, your affiant has also stopped contacting THOMAS. THOMAS is no longer a registered informant, and is a target of this investigation.

13. Another target of this case, ANTHONY SANTOIEMMA, has also provided information to law enforcement in the past. Your affiant learned that on December 5, 2003, a search warrant was executed at 4502 Forsyth Court, Upper Marlboro, Maryland, the then residence of SANTOIEMMA. Recovered at that time was a kilogram of cocaine, packaging and cutting

12

materials, and a firearm. (Ref. PGPD # 03-339-0142). SANTOIEMMA became a source of information for law enforcement in Prince Georges County, Maryland. SANTOIEMMA is not an active informant at this time. Your affiant learned through the agent that had been handling SANTOIEMMA that SANTOIEMMA reported the following information recently, in May of 2012: A guy named "Scotty" from New Jersey is living in a stash house at **1305 Hillcrest Road, Glen Burnie, Maryland 21061 (location #2).** This is SCOTT SEGAL. According to SANTOIEMMA, Scotty maintains this stash house for "Kenny DAYI," (Kerem DAYI) who operates a white Porsche Cayenne with New Jersey tags. DAYI is married and his wife works at a Bank of America branch in Crofton, Maryland. SANTOIEMMA described a business operated by DAYI known as "Krush.com." According to SANTOIEMMA, "Krush.com" sells shoes on the internet and this business is used to launder money from the drug operation.

14. SANTOIEMMA indicated that DAYI travels to California, and arranges for shipments of marijuana. SANTOIEMMA believes the marijuana is hauled back to the east coast in a trailer being pulled by a Ford F350 pick up truck. DAYI also travels to New Jersey frequently where he receives kilogram quantities of cocaine and brings the cocaine back to Maryland. SANTOIEMMA said the source of cocaine drives a Jeep with NY or NJ tag FWT4728. Both the marijuana and cocaine are stored at the house on **Hillcrest Road**, and maintained by "Scotty." SANTOIEMMA has seen both cocaine and marijuana at that location as recently as late spring 2012. SANTOIEMMA identified RYAN WHEELER as a wholesale cocaine customer of DAYI. According to SANTOIEMMA, WHEELER lives with his mother in Annapolis. SANTOIEMMA advised that WHEELER supplies ounce and pound quantities of marijuana and cocaine to others for further distribution. Your affiant noted that neither THOMAS nor SANTOIEMMA described SANTOIEMMA's involvement with this organization. The information provided by

SANTOIEMMA has to the extent possible, been corroborated, and while not complete, none has proven false. SANTOIEMMA is no longer providing information.

15.   Another source of information, hereinafter CI-1, was developed by your affiant in the first half of 2012.[2]  This person has been personally involved in this marijuana distribution organization and regularly spends time with some of the targets of this investigation. He/she has remained involved at your affiant's request to facilitate this investigation. CI-1 identified members of this organization to include DAYI, SEGAL, THOMAS, SANTOIEMMA, and WHEELER described above, as well as others. The CI has known WHEELER and SANTOIEMMA each, for several years, and has only met SEGAL and DAYI once each.   Through communications with members of this organization CI-1 has provided the following information about the targets:

a.   DAYI was identified as the leader.   CI-1 learned that DAYI allegedly lives in both Maryland and California and travels between these states often. DAYI has marijuana contacts in California and is having it shipped or driven to both Maryland and New Jersey.

b.   CI-1 identified "Scotty" (SEGAL) as the main distributor, who has a stash location in a house somewhere off of Interstate 97 in Anne Arundel County, Maryland.   SEGAL's house, **1305 Hillcrest Road, Glen Burnie, Maryland (location #2),** is less than one mile from the intersection of Route 97 and Quarterfield Road. The CI advised that SEGAL returns the proceeds of

---

[2]  This CI contacted the Anne Arundel County Police in the first half of 2012 wanting to provide information.  There were and are no pending charges on this CI, and this CI has no record of arrests or convictions.  Historically, this CI had been purchasing small amounts of marijuana from SANTOIEMMA and WHEELER, but recently, WHEELER had begun showing up with pounds, telling him the cost, and treating him instead of like a customer, but as a distributor under WHEELER. SANTOIEMMA had also taken cash into a bank where a family member of the CI works and convinced that relative to exchange bills for the group.  The CI became alarmed at the risks being imposed upon him/herself and family.  CI-1 was concerned enough about it that he/she approached the Anne Arundel County Police. This CI is involved in the personal use of marijuana and it is likely he/she provides personal use amounts to friends.  None of the information provided by this CI has proven to be false.

14

his marijuana sales to DAYI.

      c. THOMAS assists DAYI and SANTOIEMMA in their operations.   The CI learned that on several occasions, THOMAS, has gone into a local bank, First Citizens, located next door to **Prestige Annapolis, LLC, 2039 Industrial Drive, Annapolis, Maryland 21401 (location #11)** an exotic car dealership where members of this organization hang out, with approximately $100,000 in cash in small bills, and was able to have someone at the bank exchange the cash for $100 bills.  This cash was from the distribution of marijuana.  According to the CI, the organization began using a local tow truck company - at least twenty times - to move vehicles that likely contained marijuana hidden in the vehicle.

      d. SANTOIEMMA brokers deals on behalf of DAYI, and makes a commission. The CI purchased a pound of marijuana on the street within 100 feet of Prestige in early 2012 from SANTOIEMMA.  SEGAL delivered the pound to SANTOIEMMA who handed it to CI-1.  He had previously given the cash to SANTOIEMMA, who upon receiving the drugs, handed the cash to SEGAL.  SANTOIEMMA then delivered the pound of marijuana directly to CI-1.  SANTOIEMMA lives with the owner of **Prestige Annapolis, LLC,** Seyed Omid Shaffaat, at **1910 Towne Center Drive, Unit 924, Annapolis, Maryland 21401 (location #10).**   It was not clear to CI-1, what if any role the owner of Prestige plays in this drug and money laundering organization.

      e. The CI also identified WHEELER as a large marijuana dealer in his own right, but WHEELER and SANTOIEMMA use each other as a source of supply when needed. WHEELER also deals in cocaine.  The CI knows that marijuana is stored at **508 Royal Street, Annapolis, Maryland 21401 (location #16),** the home of WHEELER's mother, Lannette Wheeler. Cash, marijuana, cocaine, and psilocybin mushrooms, are also stored where WHEELER lives, at **621 Genessee Street, Annapolis, Maryland 21401 (location #15)** owned by WHEELER and his

mother together.  WHEELER and DAYI are partners in an EBay business.

      f. The CI advised that WHEELER trades and sells automobiles, and supplements that income by distributing marijuana and cocaine.  WHEELER gets packages containing pounds of marijuana from California through the U.S. mails, and uses others to receive them. The CI does not know if the source of this marijuana is the same as DAYI's or not.  CI-1 also believes that WHEELER has a local source of cocaine.

    16. CI-1 also learned through communications between conspirators, that marijuana proceeds have been sewn into handbags and delivered to the source of supply in California. According to CI-1, SANTOIEMMA supplied young women to the organization who would fly from BWI to California with these handbags.

## B. Pro-active Investigation.

    17.   Since obtaining this information from three separate sources, the investigation has confirmed the existence of this marijuana distribution organization in and around Howard and Anne Arundel Counties in Maryland, primarily dealing in marijuana, but also dealing in cocaine, and diverted pharmaceuticals.  Agents have conducted one to five months each of court ordered electronic surveillance on telephones used by SANTOIEMMA, WHEELER, SEGAL, DAYI, RUSSO and GLICKMAN.  These intercepts have confirmed that this organization, which is headed by KEREM DAYI is receiving large shipments of marijuana through the mail (20 pounds at a clip) and by vehicular delivery (50 to 400 pounds) to Maryland.  DAYI has supply contacts in California and New Jersey.  This organization also uses various money laundering methods to include bulk cash smuggling in vehicles, sending cash in parcels through the mail and commercial delivery services, structuring deposits into bank accounts and removing it (funneling) from banks in other states, and by investing money into, and removing money from, otherwise legitimate businesses

16

being operated by the same members of the conspiracy. Based upon the methods of investigation described above, members of the conspiracy and their roles in this criminal organization - relative to the search warrant applications herein are as follows: Kerem DAYI runs the organization. Your affiant knows that DAYI directs the storage of marijuana at houses rented and managed by DAYI and members of the organization, and he directs the movement of marijuana and cash between Maryland, California, Ohio and New Jersey. Scott SEGAL, Steve MADDEN, Gokhan BERGAL, Gabriel GONZALEZ, Randy GLICKMAN, Sae HWANG, Martin DANDY, Anthony SEEN and Patrick RUSSO are all in DAYI's innermost, trusted circle of lieutenants or confidants. Recently agents have also identified Goodman as a co-conspirator.

18. DAYI is the registered agent of a Limited Liability Company registered with the Maryland Department of Assessments and Taxation called "Krush NYC, LLC," (hereinafter "KRUSH") located at **8250-D Preston Court, Jessup, Maryland -20794 (location #4)**. DANDY and HWANG operate the day-to-day business of KRUSH. This company buys and sells liquidated shoes, clothing, and accessories over the internet and through EBay. As discussed below, RYAN WHEELER is also involved in the EBay and PayPal aspects of the business. Purchases by customers are mostly through PayPal. While these purchases support this business in part, the business is funded regularly through the sale of pounds of marijuana. Lineberry direcly assists WHEELER. The intercepts reveal that the members of this organization, specifically those associated with KRUSH understand that while KRUSH is a legitimate business, it facilitates and conceals the drug trafficking operation and proceeds. Twice since mid-November 2012, in the evening, after dark, agents surveilled multi-pound deliveries of marijuana to KRUSH's warehouse. DAYI and others were present for either or both of those deliveries. As more fully described below, cash from the drug trafficking and to promote more drug trafficking flows through the KRUSH bank

accounts daily.   The details about each co-conspirator is included in the description and probable cause for each location.

19.   In early November, 2012, intercepted conversations reflected that a delivery of marijuana, possibly 400 pounds, was expected in Maryland.   Agents expected the delivery at the organization's stash house, SEGAL's house at **1305 Hillcrest Road in Glen Burnie, Maryland (location #2)**, but during that time, co-conspirators Gabriel GONZALEZ and Scott SEGAL had an altercation- which included GONZALEZ breaking down the front door at **Hillcrest** - so the property was deemed no longer suitable for the delivery.[3]   On November 16, 2012, at approximately 7:49 pm, agents surveilled a Truck pulling an 18 foot enclosed trailer driven by Charles THOMSON arrive at the KRUSH business location, **8250-D Preston Court, Jessup, Maryland (location #4)**. The truck and trailer were directed around back.   Agents were not in a position to see the rear of the business.   Within 30 minutes, the truck and trailer left the area, and was followed to a Holiday Inn north of Philadelphia, Pennsylvania.   Present at the KRUSH warehouse that evening, identified by agents were, Kerem DAYI, Gokhan BERGAL, Anthony SEEN, Jeffrey Small, Christopher GARNER, Scott SEGAL, and Randy GLICKMAN.   Small left the warehouse carrying a white bag and drove away in his vehicle, a 2005 Acura.   BERGAL was observed leaving the facility carrying two suitcases.   He put them into (RUSSO's) Escalade, and drove to a hotel in Reynolds, Ohio.   The

---

[3] GABRIEL GONZALEZ had been living with SCOTT SEGAL on **Hillcrest (location #2)** until November of 2012 when SEGAL and GONZALEZ had a parting of the ways.   While living there, GONZALEZ assisting DAYI and SEGAL in distributing marijuana and running errands. GONZALEZ has been intercepted in drug related conversations with DAYI and SEGAL.   In September of 2012, GONZALEZ was stopped driving a vehicle in West Virginia - coming from Ohio - that contained in excess of $100,000.   Because of this and other problems DAYI and SEGAL were having with GONZALEZ - based upon intercepted conversations - his services are considered no longer of benefit to the organization. They are keeping him close so he can assist them in getting the seized cash back from West Virginia State Police.   It is believed he currently lives in New Jersey.

next day, BERGAL met with an unknown to deliver thirty pounds of marijuana, and returned to Maryland.

20. Again on December 11, 2012, another load of marijuana was delivered to the warehouse at **Preston Court** by THOMSON driving the same truck and enclosed trailer. Agents were able to set up ahead of time due to intercepted conversations, and video taped the entire delivery. Just before 10:00 pm, the load arrived. THOMSON went around the rear of the KRUSH warehouse, and backed up to the loading dock at the back of the business. Present at the location, agents observed GLICKMAN, GARNER, BERGAL and a few unidentified persons. THOMSON opened the back of the trailer, and pulled bales of marijuana (approximately 30" squared) out of the trailer and heaved each bale up on the loading dock. GLICKMAN grabbed one at a time and dragged them into the business. Agents saw at least four bales off loaded. THOMSON drove away, and the garage door closed. THOMSON was followed north on I-95 towards Baltimore. At approximately 11:00 pm, agents observed BERGAL back another truck with an enclosed trailer up to the loading dock. GLICKMAN and GARNER handed off at least eight large card board boxes to BERGAL who placed them into the trailer. BERGAL added stacks of flattened card board boxes, empty rubbermaid tubs, and shoe boxes to the back of the trailer, in your affiants opinion to just fill up the back and camouflage the load in the front of the trailer.

21. Before each load has come to Maryland, DAYI has gone out to California. He has gone out at least one week before the load comes, and stays out there for a week to ten days. Both times, he has stayed in an apartment at 1389 Jefferson Street, Apartment A301, Oakland, California. The lease is in the name of "Krush LLC Corporate Housing." DAYI has been intercepted speaking with the leasing agent for that apartment and directing them to send all bills and communications to DAYI at the Krush business address on **Preston Court** in Maryland. While in California, DAYI

19

operates a White Suburban with temporary tags.  It was driven to California by BERGAL.  Before

that car was in California, DAYI had used a car owned by Frederick THOMAS.

22.  The other two principals in this country-wide organization are Patrick RUSSO in New

Jersey and Randy GLICKMAN in Texas.   PATRICK RUSSO lives at 109 Hollywood Avenue,

Fairfield, New Jersey 07004, operates at least two store locations ("The Sixth Boro" at 494 Clinton

Avenue, Jersey City, New Jersey; and "KD's Kids, Womens and Mens Clothing," at 344-346

Martin Luther Boulevard, Jersey City, New Jersey) handling liquidated items similar to KRUSH.

DAYI, originally from New Jersey, and RUSSO are very close.  They speak regularly about their

liquidation and drug businesses.  RUSSO obtains quantities of marijuana and distributes it to a

network of his own.  Agents have just concluded two months of interceptions on RUSSO's

telephone.  RUSSO has been intercepted speaking with DAYI, BERGAL, and GLICKMAN.  On

December 9, 2012, RUSSO and DAYI were intercepted in conversation discussing the profit margin

on a pound of marijuana and whether they can make one or two thousand dollars off each pound

they sell.  Following the delivery of the load of marijuana on December 11, 2012, your affiant

believes that at least 100 pounds was delivered to RUSSO in New Jersey.  This belief is based upon

intercepted conversations between RUSSO and BERGAL who was delivering it to RUSSO in New

Jersey.  DAYI's mother lives at 9 Henock Avenue, Clifton, New Jersey which is approximately

eight miles from RUSSO's house in Fairfeild, New Jersey, and 13 miles from RUSSO's liquidation

business in Newark.

23.  RANDY GLICKMAN lives in Dallas Texas.  GLICKMAN has emerged as DAYI's

financial advisor relative to laundering drug proceeds.  GLICKMAN has traveled between

Maryland, Texas, and New Jersey to assist DAYI in avoiding law enforcement detection.

GLICKMAN has also been instrumental in secreting what your affiant believes was a 400 pound

20

load of marijuana at the KRUSH Business on **Preston Court,** and was present at KRUSH when both multi-pound loads of marijuana were delivered. GLICKMAN has been intercepted speaking with DAYI, SEGAL and RUSSO. GLICKMAN and DAYI have been intercepted repeatedly talking about taking proceeds of the marijuana business, and purchasing apparel for sale by the EBAY business, KRUSH.

24. GOKHAN BERGAL lives in New Jersey, at 133 LaSalle Avenue, Clifton, New Jersey 07013, and is believed to be a cousin of DAYI. BERGAL spends time in Maryland especially as an assistant to DAYI. BERGAL has been intercepted speaking with DAYI, and Patrick RUSSO and Randy GLICKMAN. Over the wiretaps, your affiant knows that BERGAL has transported pounds of marijuana from Maryland to Ohio and to New Jersey for further distribution. BERGAL has also been trusted to pick up large amounts of cash proceeds for DAYI and transport them to California for further purchases of marijuana. BERGAL was present at KRUSH on both November 16, 2012, and December 11, 2012 when multi- pounds of marijuana were delivered by Charles THOMSON.

25. The locations to be searched are identified in the foregoing pages. Behind each divider, marked with the location number, is the Application for Search Warrant, the Search Warrant, and one or more photographs of the location. Following all of the documents for the 17 locations, are ATTACHMENTS A, B and C describing the items to be recovered.

13-0063SAG ꝉo  15-0079SAG

## III. LOCATIONS TO BE SEARCHED

1.  **2437 Cheyenne Drive**
    **Gambrills Maryland 21054**

**Home of:**   KEREM DAYI (and wife, Ozlem Dayi)
              DOB: 09/01/1972, white male

**Intercepted in drug related conversations:** Yes

**Criminal record of arrest/convictions:** DAYI has been arrested 6 times for drugs, theft, counterfeit goods, and altering VIN numbers on cars; He has one theft conviction, the rest were dismissed or there is no disposition.

**Description:**   The residence is further described as a four story town house with a red brick exterior. The residence has a red front door on the right side of the front facade (facing it) above ground level. The numbers "2437" are located to the left side of the door in black numbers. There are red shutters on the two third story double windows. There are four separate windows on the second level and two white dormers on the fourth level. The residence is located in a group of six town homes and is the second residence from the left end between the residences of 2439 and 2435 Cheyenne Drive. The residence has an attached garage located to the left of the front door. The garage is accessed by a cement driveway. A set of red brick steps with a black metal rail leads to the front door of the residence.

**How do we know he lives there:**   This residence is titled in the names of Kerem

DAYI and his wife, Ozlem Dayi, in the Land Records of Anne Arundel County, Maryland.

Beginning in January of 2012, agents have surveilled DAYI in and out of the location, along with

his wife and children, or alone, on at least a dozen occasions. Recently on December 6, 2012,

DAYI exchanged texts and calls with an unknown person and ultimately was surveilled meeting

after 8 pm that night with a known drug dealer in the Annapolis area (not targeted herein) at DAYI's

home on **Cheyenne**. When DAYI first arrived at his home in advance of the meeting, DAYI

conducted counter-surveillance maneuvers before parking in front of his home. DAYI then entered

his home without knocking and without hesitation. Also on December 12, 2012, GLICKMAN, a

close confident of DAYI, was intercepted speaking with someone only identified as "Nutty." They

agreed to meet at DAYI's house, on **Cheyenne**. Agents observed Nutty arrive carrying a black and white footlocker bag into the house at **Cheyenne**. Approximately thirty minutes later GLICKMAN and Nutty left - both empty handed, and Nutty drove GLICKMAN to the KRUSH business warehouse on **Preston Court (location #4)**. Following that meeting, GLICKMAN was intercepted speaking with DAYI, and DAYI asked GLICKMAN, "How much did Nutty give?" GLICKMAN responded, " uh, Forty-Eight . . . and we gave him thirty-five." DAYI responded, "Alright, cool." Your affiant believes based upon this and other conversations, that DAYI's organization had previously fronted 35 pounds of marijuana to "Nutty" who delivered $48,000 in cash to GLICKMAN in return.    Your affiant knows that when GLICKMAN comes to Maryland from Texas, he often stays in DAYI's home. Your affiant also knows that DAYI's wife, Ozlem Dayi, is a teller at Bank of America, where a number of the bank accounts are held by the DAYIs and KRUSH NYC, LLC.   Intercepted conversations reflect Ozlem DAYI's involvement to include counting large amounts of money and allowing the storage of "packages" in the garage.  On December 6, 2012, RUSSO's Cadillac Escalade was observed in front of the residence at **Cheyenne** which DAYI drives from time to time.  On December 27, 2012, at 5:30 pm, surveillance observed Kerem DAYI exit **1716 Maco Drive, Hanover, Maryland 21076 (location #3)** the location of a new stash house described below, and get into RUSSO's Cadallic Esclade.  He was followed to **2437 Cheyenne Drive,** where he entered this residence at 5:50 pm.   In your affiant's opinion, Ozlem DAYI is also a member of this illegal conspiracy.  She has been intercepted in conversations about cash proceeds and where they are hidden, such as at DAYI's mother's house in New Jersey.[4]

---

[4] Two search warrants have already been executed at DAYI's home at **Cheyenne,** specifically on June 16, 2010 and again on September 13, 2011.  In each instance, law enforcement recovered small amounts of marijuana and smoking devices. Also in the June 2010 search warrant, agents recovered a scale, $1,200 in cash, a large light, a portable grow kit suitable for cultivating and setting up a small marijuana grow, and a how-to "Closet Cultivator" book. (Ref.

**Additional Support to search this location:** On January 31, 2012, at 10:16 am, agents followed SEGAL from his residence at **1305 Hillcrest Road in Glen Burnie, Maryland (location #2)**, to DAYI's home on **Cheyenne Drive** in Gambrills. The evening before, THOMAS - during the time he was providing information to your affiant - had advised your affiant that a meeting of higher ups was anticipated over the theft of $40,000 from the organization and that a shipment of marijuana was also expected. SEGAL went inside **Cheyenne** at 10:42 am, came back outside at 11:00 am, and met with two unknown males who were in a Black Jeep with a New York tag, FWT4728.[5] All three went inside of DAYI's house together. SANTOIEMMA arrived at 11:38 am, and went inside.   Two others, Smallwood and Robles arrived at 12:45 pm, and 2:23 pm respectively, and went inside DAYI's house. At 2:44 pm, SEGAL left DAYI's house, went back to his house at **Hillcrest**, stayed one minute, and then returned to DAYI's house at 3:14 pm. Everyone exited **Cheyenne** and items, possibly boxes, were then removed from Robles' car and put into SEGAL's car.   SEGAL and Smallwood then left **Cheyenne** and went to **Hillcrest** in SEGAL's  car. At **Hillcrest** they carried a large box and some bags inside that residence at 3:37 pm.   A few minutes later, SEGAL and Smallwood came back outside, got into SEGAL's car and left. They returned approximately 20 minutes later, removed another box from the SEGAL's car, and took it into **Hillcrest**. At 4:20 pm, SEGAL and Smallwood left **Hillcrest** each carrying large boxes and put them into SEGAL's car. They returned to **Cheyenne**. Shortly thereafter, at 4:43 pm, all of those who had arrived throughout the day at **Cheyenne**, left.

In addition to what your affiant believes was a meeting of "higher-ups" and the delivery of

---

AACP #2010-716424.)

[5] In May of 2012, SANTOIEMMA specifically identified this vehicle by this tag as DAYI's source of cocaine at that time.

marijuana surveilled on January 31, 2012, described above, agents have observed other activities at **Cheyenne Drive**, DAYI's house.  For example, on March 23, 2012, at 9:40 am, DAYI left SEGAL's house on **Hillcrest** carrying a small black bag, placed the bag inside his gray BMW, and left the area. At 10:17 am, the BMW was observed at DAYI's house on **Cheyenne**. At 11:13 am, DAYI left his house on **Cheyenne**, and left the area in his BMW. At 11:35 am, the BMW was observed parked outside of **8250-D Preston Court**, the KRUSH business warehouse.  On March 30, 2012, at 7:00 am, when agents began surveillance at **Hillcrest**, agents observed DAYI's BMW already parked out front. At 8:52 am, DAYI exited the residence, retrieved a blue duffel bag from the trunk of his BMW, and returned inside the residence.  Just after 9:00 am, DAYI and an unknown male left **Hillcrest**, got into the BMW and were followed to DAYI's house on **Cheyenne**. The unknown male retrieved a back pack out of the back seat, and they both went inside.  A few minutes later, at 9:22 am, the unknown male came back outside, retrieved several brown paper bags and another back pack from the trunk and returned inside.  At 9:43 am, the unknown male put a cardboard box in the trunk of the BMW and shortly thereafter DAYI, the male, and two small children, exited **Cheyenne**, and drove away in the BMW.

   **Items to be recovered at the location:**  Agents expect to find drugs, records reflecting the operation of the criminal enterprise described herein, money, assets, and other documents, more fully described in ATTACHMENT A.

2.     **1305 Hillcrest Road**
       **Glen Burnie, Maryland 21061**

**Home of:**     SCOTT RUSSELL SEGAL   - Until at least December 1, 2012
                 DOB: 05/6/1977; white male

**Description:**  The residence is further described as a single story duplex, and while facing the structure, 1305 is the right half of the building. The front is covered in gray and brown stone, and there is a bay window plus three smaller windows across the front, framed in white with blue shutters. From the right side, first there is a window, and then another window and front door are set back from the front wall. There is a porch light to the right of the front door, and the porch floor is covered in green outdoor carpet. There is a small white fence dividing the front yard between the two units. The door to the unit, not intended to be searched has a white door with an "A" marked upon it. The driveway running along the front of the house is covered in gravel.

3.     **1716 Maco Drive**
       **Hanover, Maryland 21076**

**Home of:**     SCOTT RUSSELL SEGAL   - Beginning December 1, 2012
                 DOB: 05/6/1977; white male

**Description:**  The residence is further described as a single family home with a reddish brick exterior on the front and white siding on each side. The residence has dark blue shutters and a dark blue front door. There is a palladian style window over the front door on the second level. The numbers "1716" are located to the left side of the front door in gold letters on an off-white colored wood placard. A black metal mailbox with the numbers "1716" in white numbers is located in front of the residence. The residence has an attached garage located on the left side of the residence at the top of the black asphalt driveway. A set of approximately fifteen concrete steps with a black metal handrail leads to the front door of the residence.

**Intercepted in drug related conversations:** Yes

**Criminal record of arrest/convictions:** One conviction for drug possession.

**How do we know SEGAL uses both of these locations:** Scott SEGAL has rented the house at **1305 Hillcrest Road, Glen Burnie, Maryland 21061 (location #2)**, from the inception of this investigation until December 1, 2012, at which time he began to move to **1716 Maco Drive, Hanover, Maryland 21076 (location #3).** Beginning in January of 2012, agents have conducted multiple surveillances at **Hillcrest** and have watched as SEGAL picked up parcels from the post

office, believed to be full of marijuana and brought them home to **Hillcrest**, had parcels delivered to

**Hillcrest**, had "dirty" trash removed from **Hillcrest** (trash containing packaging materials and

residue), and delivered cash to banks as well as packages believed to contain cash to the post office.

In fact, in early March of 2012, Postal Inspectors in San Francisco, California seized two packages

going to two different addresses in Oakland, California. Each contained $20,000 in cash. The

return address on both was "Scott SEGAL, **1305 Hillcrest Road, Glen Burnie, Maryland 21061.**"

THOMAS, SANTOIEMMA, and CI-1 each described SEGAL's activities and identified the house

on **Hillcrest** as a stash house for the organization.  Beginning on December 1, 2012, under the

direction of DAYI, SEGAL began moving out of **Hillcrest** to a new house at **1716 Maco Drive,**

**Hanover, Maryland 21076 (location #3).**  DAYI and other members believed the stash house at

**Hillcrest** had been compromised, and the move to **Maco** was so the organization would have a new

stash location.  Agents have just concluded three 30 day interception on SEGAL's telephone.   In

addition to marijuana, SEGAL has been intercepted dealing in diverted pharmaceuticals.  SEGAL

speaks very freely about drugs and money stored and packaged and sold from his home, as well as

about his drug dealings with others.  On December 13, 2012, after the second marijuana load,

SEGAL picked up MADDEN's 10 pounds from **Preston Court** and brought them to his new stash

house on **Maco Drive**.  On December 26, 2012, SEEN was intercepted telling DAYI that he had

just dropped SEGAL off at **Hillcrest**.  On January 3, 2012, SEGAL was observed exiting **Hillcrest**

at 3:30 pm.  SEGAL is still using this location or is moving very slowly in cleaning it out.  Also, on

December 27, 2012, at 5:30 pm as mentioned above, surveillance observed Kerem DAYI exit **1716**

**Maco Drive**, and leave the area.  Based upon a year's worth of investigation, there is reason to

believe evidence of this conspiracy has been and appears to still be at **Hillcrest**.   There is now also

reason to believe that evidence of this conspiracy will also be found at **Maco.**

27

**Additional Support to search these locations:** SEGAL's role has been key to the local distribution of marijuana in Anne Arundel County. This belief has been confirmed through conversations intercepted over SEGAL's telephone. In a call intercepted on October 12, 2012 at 9:02 pm, SEGAL told an unknown male that SEGAL needed someone to move out to Northern California, near Oakland, rent an apartment paid for by the DAYI organization, so that people could drop off marijuana at that apartment to be sent east. Then that someone would "vacuum seal em, with gloves on - no fingerprints" - and deliver the vacuum sealed marijuana to a girl who "brings them to the post office." This description of activity is consistent with the evidence gathered to date that reflects one of the  methods used by this group  for transporting the marijuana from California is through the mail to the east coast. SEGAL was also present on November 16, 2012 at **Preston Court** when the 400 pounds of marijuana was delivered to the offices of KRUSH NYC, LLC. SEGAL has been intercepted in drug related conversations with DAYI, GLICKMAN, WHEELER, GONZALEZ, SEEN, and GARNER.  A typical surveillance of activities in and out of **Hillcrest**, is described above in reference to activity also taking place at **Cheyenne**, DAYI's house. Interceptions in December, reflected that GARNER, who had been living in a home less than a **block from** Cheyenne, **would be moving into** Maco **after Christmas.** GARNER **has been** intercepted in drug related conversations with DAYI.  GARNER was present at KRUSH on **Preston Court** in Jessup, Maryland during both deliveries of multi-pound loads of marijuana.  GARNER has been surveilled driving with DAYI and with GLICKMAN when GLICKMAN has been visiting from Texas.  Intercepted conversations while SEGAL was living at **Hillcrest**, reflected that inside that home were scales, drugs, packaging materials, mailing materials, cash, and possibly weapons. Your affiant believes there is every reason to believe that the activities that have taken place at **Hillcrest**, remnants of which may still be there, will continue at **Maco** and that the same items can

28

be expected to be found at **Maco**.

**Request for No Knock entry:**  SEGAL has been intercepted regularly talking about firearms and about hurting people. On December 18, 2012, SEGAL called an unknown male and said, "I had to shoot this nigger right in his fucking face..... Yea and he lived...." On December 11, 2012, at 12:39 pm, SEGAL placed a call to an unknown male where he said, "I'm out of my cigarettes that I normally smoke and I'm out of my medication and umm I'm thinking like really crazy fucking things dude like murdering people and stabbing people and shooting people and then I went over to somebody's house last night and I shot their house up....." Agents found no evidence of any such events, and consider that SEGAL could be delusional or hallucinating. Finally, on December 20, 2012, SEGAL called an unknown female and said, "Whatever you do, do not go under my pillow and look at my gun. It's fully loaded, it has no safety. . ." For these reasons, agents are requesting a no-knock entry into both of these locations.

**Items to be recovered at the location:**  In both locations, agents expect to find distribution amounts of marijuana, packaging and other paraphernalia reflecting those amounts, firearms, records reflecting the operation of the criminal enterprise described herein, money, assets, and other documents, more fully described in ATTACHMENT C.

4.      **8250-D Preston Court**
        **Jessup, Maryland 20794**

**Location of:   KRUSH NYC, LLC**
               Articles of Organization Filed: September 17, 2010
               Resident Agent: KEREM DAYI

**Description:**   The business location is further described as a one story box warehouse constructed of brown brick, with red brick horizontal accent stripes across the tope of the facade, and consisting of multiple individual suites. Each suite is identified with a red placard listing both the suite numbers and letter. Specifically Suite 8250 D has the red placard with "8250 D" in white numbers and letters. The placard is affixed to the building on the right side of the front door. The front door is located at ground level and is a standard commercial glass doorway. The glass of the door and the front windows are frosted. The rear of 8250 Suite D has a commercial style steel door and roll up garage door. The steel door is mark with the name 202 Big Wheels.

   **How do we know KRUSH NYC, LLC operates from this location:**   Documents on file

with the State of Maryland reflect **Preston Court** as the business location for KRUSH. Repeated

surveillance place almost all of the conspirators there at one time or another, especially during

normal working hours.   On two occasions, agents have recovered trash inside a dumpster in the rear

of **8250-D Preston Court**.   On March 14, 2012, agents recovered multiple shipping labels with

"KRUSH NYC, LLC" printed on them. Documents in the name of Ryan WHEELER were

recovered, including two Paypal packing slips from "KRUSH NYC, LLC" with

"ryanburtonwheeler@yahoo.com" listed upon it; a customs declaration dispatch note from Ryan

WHEELER, **508 Royal Street, Annapolis, Maryland 21401 (location #16)**, to a party in Hong

Kong dated "3/13/12"; and a label from a party in Ohio to Ryan WHEELER at the **Preston Court**

address. On May 30, 2012, a trash bag from that dumpster yielded a shipping label to DAYI's wife,

a receipt and invoice from "KRUSH NYC," and a small amount of marijuana.   Wiretap intercepts

have captured DANDY, HWANG, DAYI and others discussing the daily business at **Preston**

**Court**. This is the location where, on November 16, and December 11, 2012, multi-pound

deliveries were received out of a trailer, described above in paragraphs 19 and 20.

30

**Additional Support to search this location:**   Intercepts have reflected that until various customers, such as SEEN and MADDEN, have picked up their pounds of marijuana, it has been stored at the KRUSH warehouse at **Preston.**

**Items to be recovered at the location:** Documents and other evidence related to the drug operation, the money laundering, and the business of KRUSH NYC, LLC, and 202 Big Wheels will most certainly be located within this location.  Based upon the recent activity, your affiant further believes there is probable cause that there is marijuana and other evidence of the drug operation inside of this location, more fully described in Attachment A.

5.    **3435 Liberty Gardens Road**
      **Randallstown, Maryland 21244**

**Home of:**    STEVEN NEIL MADDEN
                DOB: 09-19-1969; black male

**Intercepted in drug related conversations:** Yes

**Criminal record of arrest/convictions:** 5 arrests for stolen vehicles and/or drugs; He has one 1991 conviction for Interstate Transportation of more than 28 grams of cocaine for which he received a sentence of 10 years with 5 years suspended.

**Description:** The residence is further described as a two story single family residence with gray siding and white trim around the windows and doors. The front door is white in color and located behind a white wrought iron security door. A driveway/parking pad is located to the left side of the residence. The residence does not have any specific numbers affixed to the structure or a mail box located outside at the curb. The residence 3435 is one of only four residences on Liberty Gardens Rd. The location 3435 is located between residence 3437 and 3433. The neighboring residence 3437 is located to the left of the suspect residence and the numbers "3437" are displayed on a mailbox at the end of the driveway. The neighboring residence 3433 is located to the right of the suspect residence and the numbers "3433" are displayed on residence.

**How do we know he lives there:**   The title owner of this property is Rhonda Madden, MADDEN's daughter. She is 19 years old. According to Maryland Land Records, she purchased this property in a non-arms length transaction from KRUSH. On December 17, 2011, Baltimore County Police working on an auto theft investigation, arrested Steven MADDEN. MADDEN was operating a BMW that had been stolen from its owner in Prince Georges County, Maryland, in a carjacking. MADDEN claimed to have just purchased the vehicle. Based upon statements of MADDEN and evidence recovered, a search warrant was obtained for both his home, **3435 Liberty Gardens Road, Randallstown, Maryland,** and a storage unit. At his home agents recovered 503 schedule III anabolic steroid pills, and in excess of $16,000 in cash. In the storage unit, agents recovered hydroponic grow equipment (light, tubs, hoses, pipes, cooler, filter) consistent with equipment that would be used for a small marijuana grow operation, a vacuum sealer, a digital scale,

and $120,795 in U.S. currency.  The cash, more than $136,000 was seized.  MADDEN is

contesting the forfeiture and has claimed in sworn documents that the cash was payment to him

from his business, "KRUSH NYC, LLC," and was furthermore to be used to purchase inventory for

liquidated businesses.  Your affiant notes, he did not however, indicate where the cash came from.

These answers, given under the penalty of perjury, dated November 15, 2012, indicate MADDEN's

affirmation that he lives at this address on **Liberty Gardens**.  On January 8, 2013 at 2:26 pm,

agent's observed MADDEN's Chevy Cobalt and sport motorcycle, that he has been observed

driving over the past several months, parked on the street in front of the location.

**Additional Support to search this location:** As indicated MADDEN is a principal of

KRUSH, and is also personally involved in obtaining amounts of marijuana (ie, 10 pounds at a time)

for further distribution to his own customers.  MADDEN has been intercepted speaking with DAYI

and WHEELER over the intercepts on their telephones.  MADDEN knows the business at KRUSH

is used to facilitate the drug operation, and knows that large amounts of marijuana have been stored

and distributed from the warehouse at KRUSH.  Following the delivery of the load of marijuana to

KRUSH on November 16, 2012, MADDEN obtained 10 pounds from SEGAL for further

distribution by him.  Following the second load on December 11, 2012, 20 pounds was left for

MADDEN to pick up at the warehouse based upon intercepted conversations between DAYI and

GLICKMAN discussing to whom the balance of the delivered marijuana was owed.

**Request for No Knock Entry:** MADDEN was arrested in 2008 in possession of drugs and

a firearm.  MADDEN has also been intercepted eluding to acts of violence and shooting people.

For example, on October 10, 2012, MADDEN called WHEELER looking for him.  WHEELER

advised that he was around the corner.  MADDEN said, "Alright some niggers pulled up. I thought

you was setting me up nigger.  I was about to be blasting out here."  In your affiant's opinion, this is

33

unfortunately the nature of drug trafficking and MADDEN is attuned to it. . For these reasons, agents are requesting a no-knock entry into this location.

**Items to be recovered at the location:**   Agents believe there is probable cause that there is a firearm within this location.  Agents also expect to find distribution amounts of marijuana, packaging and other paraphernalia reflecting those amounts, records reflecting the operation of the criminal enterprise described herein, money, assets, and other documents, more fully described in ATTACHMENT C.

6.    **1175 Gator Court**
      **Arnold, Maryland 21012**

**Home of:**     MARTIN DANDY
                 DOB: 5/31/1981; white male

**Intercepted in drug related conversations:** Yes

**Criminal record of arrest/convictions:** No

**Description:**  The residence is further described as a two story townhouse.  It is a inside unit, second from the end, and is covered in light brown siding.  Facing the property, the front door is on the right side on the first floor and is red in color.  There is a glass storm door trimmed in brown as well.  There is a cement sidewalk leading to the front door and one step.  To the left of this door, is a light, and beneath the light in black appear the numbers "1175."  There is one window on the left side of the first floor, and two on the second floor.  The windows are trimmed in white.

**How do we know he lives there:**  Both of DANDY's vehicles, a 2006 Dodge Magnum, and a 2006 Toyota SUV, have been surveilled at **Preston Court**, and/or at **Gator Court**.  Both vehicles are registered to DANDY and his wife at this **Gator Court** address, and DANDY's driver's license is also to this address.  On February 28, 2012, DANDY was surveilled arriving at SEGAL's stash house on **Hillcrest Road**.  DANDY carried a backpack into the house, and minutes later exited carrying two boxes that he put into his car.  From there he was followed to his home on **Gator Court**.  The next morning, February 29, 2012, DANDY left **Gator Court**, went to **Hillcrest Road**, went inside (agents not close enough to see if he carried anything), and minutes later came back out.  DANDY got into his car and went to work at **Preston Court**, and was observed carrying a backpack into **Preston Court**.  On January 9, 2013, at 7:19 am agents observed DANDY exit his house on **Gator Court**, get into his Dodge Magnum, and drive away.

**Additional Support to search this location:**  DANDY operates the legitimate business at KRUSH, but is fully aware that the business is physically used to facilitate the drug operation.  He knows the bank accounts are infused with drug proceeds, and are also used to conceal the source of

those funds. DANDY has been intercept in pertinent conversations speaking with DAYI GLICKMAN, SEGAL and WHEELER. When the November 16, 2012, load of marijuana was stored in the warehouse, DANDY was upset and had words with DAYI and GLICKMAN.   In the days following that delivery at **Preston Court**, GLICKMAN and DAYI were intercepted discussing that Martin DANDY was upset about the marijuana being delivered and stored at the warehouse because it endangered the liquidation business. According to GLICKMAN, DANDY had given all of the employees two days off with pay because the smell of the marijuana was so strong. DANDY actually told the employees why they were being given leave with pay. DANDY did not want anyone asking questions or being uncomfortable. DAYI was upset about that (the pay), and he and GLICKMAN had a conversation about DANDY's attitude and behavior. DANDY was upset and had told GLICKMAN that they didn't even try to find another location to stash it. GLICKMAN had told DANDY that "certain things . . couldn't be stopped in midstream." DAYI told GLICKMAN that DANDY "forgets . . where it all comes from. . . " Your affiant understand that to mean that DANDY forgets that it is drug money that is funding the liquidation business in the first place. Later DAYI said to GLICKMAN that DANDY ". . . forgets whose place that is, and where his place is in that food chain." Before the second shipment on December 11, 2012, at 7:47 pm, DANDY and GLICKMAN were intercepted discussing the impending arrival of the marijuana. DANDY asked GLICKMAN "Do you want me to cover up the cameras?" They agree to do that, and DANDY is observed returning to the warehouse after he had already left for the night and going inside for twenty minutes. DANDY told GLICKMAN that DANDY would take care of uncovering the cameras first thing the next morning, since, "I'm the first one there, in the morning. I'll just do it in the morning." Following the shipment, GLICKMAN and DANDY were intercepted discussing the twenty pounds of marijuana being held at the warehouse for MADDEN.

36

**Items to be recovered at the location:** Agents expect to find records reflecting the operation of the criminal enterprise described herein, money, assets, and other documents, more fully described in ATTACHMENT B.

•

### 7.    2653 Didelphis Drive
###         Odenton, Maryland 21113

**Home of:**    SAE HYONG HWANG
                DOB: 10-07-1979; Asian male

**Intercepted in drug related conversations:** Yes

**Criminal record of arrest/convictions:** Yes: 3 arrests; assault with no disposition, and two drug arrests resulting in one PBJ.

**Description:** The residence is further described as a 3 story townhouse with a white vinyl siding exterior. Under the first floor windows the wall is red brick. The residence has a tan colored front door with small windows over the top of it. The numbers "2653" are located in black numbers to the right of the front door. There are two windows to the right of the door (facing the home). The residence has an attached garage located to the rear of the residence. The numbers "2653" can be located to the right side of the white metal garage door. The numbers are black in color. The residence has a deck located in the rear of the residence with a glass sliding rear entrance. The residence is located in a group of town homes located at the intersection of Pediment Avenue and Didelphis Drive. Two concrete steps leads to the front of the residence.

**How do we know he lives/works there:** The deed to this home is in the name of

SAE HWANG, and his driver's license is listed to this address. His 2002 Honda Accord is

registered in his name to that address, and has been surveilled at **Didelphis Drive** and repeatedly at

**Preston Court.** Specifically, on December 27, 2012, at approximately 12:30 pm HWANG was

observed coming out of the home at **Didelphis Drive,** getting into his Honda Accord, and leaving

the area.   Your affiant knows he works at **Preston Court** because in addition to seeing his vehicle

outside of **Preston Court** regularly, he has been seen at that location, and is intercepted regularly

discussing the business of KRUSH, the warehouse, the employees, drugs, and the finances with

other members of this conspiracy.  On January 10, 2013 at 8:00 am, Hwang's White Honda was

observed in front of the house.

**Additional Support to search this location:** HWANG works week days at KRUSH on

**Preston Court.**  HWANG has been intercepted speaking with DAYI and WHEELER, about the

38

legitimate business at KRUSH - whether WHEELER's name was still associated with it - and about the marijuana trafficking. HWANG assisted in secreting both multi- pound marijuana shipments at **Preston Court** in Jessup inside the warehouse operated by KRUSH. On November 29, 2012, HWANG and DAYI were intercepted talking about SEGAL. HWANG told DAYI that "I gave him (SEGAL) two checks (two loads of pounds of marijuana). . . ." DAYI asked "did he pay for them or no?" HWANG responded "No he hasn't paid for those two." DAYI told HWANG "Alright write down the two that he hasn't paid for so we know...so I know." HWANG responded "Yeah, I, I'm keeping track of all that. He's gotten eight (pounds of marijuana) and he's gotten ten (pounds of marijuana), he's paid for eight." In this conversation, your affiant believes that DAYI and HWANG were discussing how much marijuana HWANG had given to SEGAL. DAYI instructed HWANG to keep write everything down in a drug ledger so they could keep track of what SEGAL owed. Also in reference to MADDEN and the twenty pounds of marijuana he was supposed to pick-up from the first marijuana delivery on November 16, 2012, MADDEN only took ten pounds. MADDEN wanted to sell that first before he took another ten pounds. Before he could get the second ten pounds, the next delivery came in on December 11, 2012 which included a third ten pounds for MADDEN. After the second delivery, GLICKMAN and DAYI sent SEGAL to KRUSH at **Preston Court**, to pick up MADDEN's twenty pounds to keep with him at **Maco**. On December 13, 2012, in a conversation between GLICKMAN and HWANG, they discussed exactly where in the warehouse these two ten pound packages were still secreted. DANDY was also involved in this conversation. Finally, HWANG has two prior arrests for possession of marijuana.

    **Items to be recovered at the location:**   Agents expect to find records reflecting the operation of the criminal enterprise described herein, money, assets, and other documents, more fully described in ATTACHMENT B.

8.   **104 Wheeler Avenue**
     **Baltimore, Maryland 21223**

**Home of:**   DONALD Goodman
              DOB: 02/24/1949; black male

**Description:**   The residence is further described as as a two story plus basement
level brick townhouse. There are five steps up to a covered front porch, where the
front door is located. The home has a white storm door and the front door has a
diamond shaped window in the upper portion of it. The letters 104 in black on a
white background running at an upward diagonal are to the right of the door.   A
large window to the left of the front door faces Wheeler Avenue. There are two
windows on the second level of the home.  There a large bushes in front of the home.

9.   **14 Church Lane**
     **Baltimore, Maryland 21208**

**Location of:** G-Tech Luggage Repair Shop.

**Description:** The location is a two story light brown brick building. Surrounding the
building a black top parking lot. There is a small series of concrete steps centered on
the front the building with a small retaining wall.On the retaining wall in green
lettering is "14 Church Lane." Above the front door is a green awning that bears
"Watch & Jewelry Repair House – 410-653-2099." Along the right side of the
building (facing it), is a sidewalk bordered by another small brick retaining wall. The
sidewalk leads to a glass door at the back corner.  To the left of the glass door are
three black mailboxes, a door buzzer, and a small outdoor light.  A white and red
sign bearing "G-Tech Luggage Repair Shop – 443-940-0036" is posted on the glass
door, and in a second story window on that facade on the left. G-Tech is located on
the second floor.

**Intercepted in drug related conversations:** Yes (Goodman)

**Criminal record of arrest/convictions:**   A 1982 arrest for Armed Robbery
with no disposition.

**How do we know he lives/works there:**  On November 29, 2012, Goodman was

observed going in and out of the home on **Wheeler Avenue.**    Goodman has been surveilled

driving a silver Toyota Scion, which has also been observed in the driveway at **Wheeler Avenue.**

On January 8, 2013, at 7:00 pm, this Scion was parked in front of the residence on the street.   This

Scion is registered in Goodman's name at his address at **104 Wheeler Avenue, Baltimore,**

40

**Maryland.**   Goodman also works at a luggage shop, now located at **14 Church Lane, Baltimore,**
**Maryland 21208.** Your affiant knows this based upon surveillances and intercepted conversations
and texts, described below.

  **Additional Support to search this location:** On two occasions, agents followed SEGAL to
a location at 1401 Reisterstown Road, Pikesville, Maryland. There is a small office building at that
location and it is unknown at that time where inside the building SEGAL went. The first time, on
February 21, 2012, between 12:11 pm and 3:40 pm, agents followed SEGAL from his home on
**Hillcrest,** to the Crofton Post Office, back home, to the Glen Burnie Post Office, and then to this
location in Pikesville. Simultaneously SANTOIEMMA had been seen leaving SEGAL's house just
before noon. SANTOIEMMA was then observed at **Preston Court** at 12:13 pm, and moved his car
to behind the business - where the loading dock is located - five minutes later.   SANTOIEMMA left
**Preston Court.** At the Reisterstown Road location, SEGAL met with SANTOIEMMA and DAYI
out in the parking lot. After meeting in Pikesville at 3:40 pm, for no more than five minutes,
SEGAL, DAYI and SANTOIEMMA left.   All three were observed back at **Hillcrest** at 4:07 pm.
At 5:31 pm SANTOIEMMA and DAYI were observed carrying a large trash bag out of **Hillcrest.**
They took it into **Cheyenne.** Again on March 29, 2012, agents followed SEGAL to the Pikesville
building and observed SEGAL exit the building carrying a large cardboard box, which he placed in
the trunk of his car. SEGAL was followed back to his residence.  He drove from Pikesville to Glen
Burnie on I-695 and I-97 and at times was traveling at least 80 miles per hour.  Agents conducted
closer surveillance at this Pikesville address. In the basement was a luggage repair shop.  There was
a pharmacy on the ground floor, and a half dozen offices at most on the top floor. Two offices were
clearly vacant. The others were a doctor's office, and the rest just said "Private."  As described
above, CI-1 had advised your affiant that marijuana  proceeds have been sewn into handbags and

delivered to the source of supply in California, and that SANTOIEMMA supplied young women to the organization who would fly from BWI to California with these handbags. So your affiant began to suspect that the luggage store at the location on Reisterstown Road was where SEGAL, DAYI, and SANTOIEMMA were visiting. On October, 15, 2012, at 11:49 am, DAYI received a call from Goodman. Goodman advised " . . . I already moved now, got me, I got myself in another place.. . So I got a new address. . . I'm set up and ready to roll." DAYI responded, "Alright, cool. . . text me your address." A few moments later, DAYI's telephone received a text: "My new address is g-tech luggage repair shop 14 church lane, pikesville, maryland 21208 upper level" . On November 20, 20012, Goodman called DAYI and said he had two pieces of luggage, and told DAYI that Goodman thought the post office might have inspected the package. He said it looked as if it had new tape on the boxes. DAYI replied that he would check it when he at got there. On November 25, 2012, agents conducting surveillance at **14 Church Lane**, upper level, observed Goodman and another enter the business at 11:20 am. At approximately 11:35 am, agents observed Goodman carry two large boxes - sealed with red and blue tape - out of the business and into his silver Toyota Scion. Goodman left the area. At noon, at Security Square Mall agents observed Goodman's unoccupied Scion, parked next to a Black BMW (BERGAL's leased vehicle) with DAYI in the driver's seat and Goodman in the passenger seat. They exited the BMW, moved the boxes from Goodman's car into the BMW, and they both left in separate directions. Your affiant believes that these packages contained pounds of marijuana. Based upon the intercepted conversations and surveillance, your affiant believes that Goodman is receiving marijuana in the mail for the organization.

    **Items to be recovered at these locations:** Inside **Wheeler Avenue,** agents expect to find records reflecting the operation of the criminal enterprise described herein, money, assets, and other

documents, more fully described in ATTACHMENT B.   Inside **Church Lane**, agents expect to

find records reflecting the operation of the criminal enterprise described herein, money, assets, other

documents, and based upon the recent activity, there is probable cause that there is marijuana inside

of this location, more fully described in ATTACHMENT A.

**10.**     **1910 Towne Centre Boulevard**
          **Unit 924**
          **Annapolis, Maryland 21401**

**Home of:**     ANTHONY CAESAR SANTOIMMA (and Seyed Omid Shafaat)
                DOB: 04/29/1969, white male

**Description:**   The residence is further described as an apartment within the
Marnier Bay Apartments at the Annapolis Towne Centre in Parole/Annapolis,
Maryland. The apartment building has two access points. The Main door is located
at street level with a blue canopy, red trim, and white lettering displaying,
"MARINER BAY AT ANNAPOLIS TOWNE CENTRE." The numbers "1910" are
also displayed below the name on the canopy which are black in color and white
background. The other access door to the apartment building is located on the third
floor near the parking garage and retail stores. To the left of these (controlled access)
glass doors are blue lettering stating, "MARINER BAY AT ANNAPOLIS TOWNE
CENTRE." Unit 924 is located on the ninth floor. Upon exiting the elevator one
would turn to the right and then immediately left, following the signs to units "913-
926." The targeted apartment is located on the right hand side of the hallway.   The
door to Unit 924 is dark brown wood with a handle and deadbolt, and it opens left to
right. To the left of the front door is a brown wooden shelf, and the numbers "924,"
which are brown in color with a cream background. To the right of the door is a fire
extinguisher.   Above the door on the ceiling is a green "EXIT" sign with an arrow
pointing across the hall. Across the hall from the door of Unit 924, is a doorway
leading to the stairwell.

**11.**     **2039 Industrial Drive**
          **Annapolis, Maryland.**

**Location of:**   Prestige Annapolis, LLC
                Owner: Seyed Omid Shaafat

**Description:** The business, Prestige Annapolis, LLC, is located behind Baltimore Coffee
and Tea Co. at the intersection of Industrial and Service Drives. The front main double door
is glass with brown trim. Facing the building, the address numbers are black on white to the
right side of doors. The building is a light gray- tan with "Prestige Service Center" across the
top side of the front. There is a metal roll-up door with black overhang on the right side.
There is a brown door to the left side of roll-up door and a white door to the right.
Numerous vehicles are parked to the front and side of the business.

**Intercepted in drug related conversations:** Yes (SANTOIEMMA)

**Criminal record of arrest/convictions:** SANTOIEMMA: Two arrests (one involving
a firearm and a kilogram of cocaine, no convictions. Shaffaat has no convictions.

**How do we know he lives/works there:** Initially CI-1 has been to the apartment at **Towne**

44

**Center** with SANTOIEMMA. CI-1 has described seeing numerous (1000) guns that are believed to be owned by SANTOIEMMA's room mate, Seyed Omid Shaffaat (who does not have a criminal record), and has seen Shaffaat there as well.  According to the CI, Shaffaat always carries a firearm on his person.  Shaffaat is the owner of Prestige Annapolis, LLC  During the spring of 2012, when the focus of the investigation was on SANTOIEMMA, SANTOIEMMA and Shafaat were observed at both locations, **Towne Center** and **Industrial Drive** on a regular basis.  Through affirmative operations with CI-1, your affiant knows that SANTOIEMMA spends a great deal of time at Prestige, whether he officially works there or not.  SANTOIEMMA has been surveilled at least a dozen times operating luxury vehicles (Ferrari, Lambroghini, Maserati) with "Prestige" placards displayed on the cars.  The CI purchased a pound of marijuana on the street within 100 feet of Prestige in early 2012.  On September 28, 2012, CI-1 purchased a fourth pound of marijuana directly from SANTOIEMMA on the grounds of the **Towne Center** complex.  SANTOIEMMA was last surveilled at Prestige Annapolis on **Industrial Drive** on October 10, 2012.  Your affiant also knows that in December of 2012, and before that, the parking garage at **Towne Center**, houses a half dozen luxury cars with "Prestige" placards on them.   Your affiant also knows that Prestige Annapolis does not possess an auto dealer's license and affects the transfer of vehicles as a "broker." Agents have not confirmed lease information for **Towne Center**, since historically, the leasing company there is not considered law enforcement friendly.  On January 10, 2013 at 8:45 pm, agents observed SANTOIEMMA leave the front of the building at 1910 Towne Center, go into the garage and got into a vehicle.

**Additional Support to search this location:**  SANTOIEMMA, as described above, informed police in the spring of 2012 about parts of this organization.  He left himself out of the telling. Between January and September of 2012, your affiant confirmed his involvement in this

group through drug related consensually monitored conversations, controlled purchases and surveillances. These surveillances included his participation in a meeting of "higher-ups" on January 31, 2012, at DAYI's house on **Cheyenne**, at another meeting of "higher ups" (SANTOIEMMA, WHEELER, THOMAS, and DAYI) on June 14, 2012, at Prestige Annapolis on **Industrial Drive**, traveling to and from the luggage business in PIkesville, Maryland described above, and being present at both SEGAL"s house on **Hillcrest**, the stash house, and at the warehouse at KRUSH on **Preston**. Since September of 2012, after a month on his telephone, it appeared that SANTOIEMMA was obtaining cocaine and marijuana from Sean Shannon, who lives at **Tilghman (location #12).** On May 19, 2012, Nebraska State Patrol troopers stopped an eastbound 2006 F-350 pickup truck with Nevada tags on Interstate 80. Following a canine alert, a search revealed 52 kilograms of marijuana in the vehicle. The driver, Peter RIVERA, advised that he picked up the marijuana and was dropping it off at a truck stop, possibly in the Bronx. He said he would be paid $1,000 to make the delivery. He did not give any other details. Records reflected that RIVERA, the title owner of the truck, purchased the truck from Prestige Annapolis, LLC in Maryland, on April 3, 2012, and the lien on the vehicle was held in the name of "Krush NYC, LLC c/o Kerem DAYI, in Gambrills, Maryland." Agents left two messages on the telephones listed to Krush and never received a return call. No claim has been made for the return of this truck. A check of pen registers being operated as part of this investigation, revealed that on April 13, 2012, SEGAL's telephone had a one minute contact with one of RIVERA's telephones, and on May 14, 2012, DAYI's telephone had a five second contact, believed to be a text with one of RIVERA's telephones. On May 20, 2012, the day after the seizure and arrest of RIVERA, the pen register operating on DAYI's telephone recorded four outgoing contacts to RIVERA's telephone. One of no duration; and three with durations between 30 seconds to a minute. The first three were within 4

minutes of each other, and the fourth was an hour later. Your affiant knows that on May 20, 2012, when DAYI was repeatedly trying to reach RIVERA, RIVERA's telephone was in the custody of the Nebraska State Police. Next door to Prestige Annapolis is First Citizens Bank. On at least two different occasions, agents have surveilled members of this conspiracy walking from Prestige into the bank with stacks of cash. CI-1 had advised that the organization uses that location to launder money, and your affiant knows that Prestige Annapolis has bank accounts there. According to personnel at the bank, hundreds of thousands of dollars funnel through Prestige's accounts in a day, from time to time. Initial attempts to subpoena those records - this being a small community bank - resulted in targets being advised that the "Feds" were looking at Prestige's accounts. No further attempt has been made. Your affiant believes that based upon the evidence of meetings occurring at Prestige Annapolis, the information about cash deposits, the surveillances of cash being taken into First Citizens, and SANTOIEMMA's involvement with both Prestige Annapolis and this organization, that there is probable cause that Prestige is assisting in laundering cash for this organization. Only documents recovered inside Prestige on **Industrial Drive** and the apartment at **Towne Center** - in the control of Shafaat, will reflect whether the cash going through these accounts is justified by the business being conducted at Prestige.

**Request for No Knock Entry:** Shaffaat does not have a criminal record and therefore the possession of any of these firearms, alleged to be 1,000 firearms, without more, is not illegal. It is not clear that SANTOIEMMA has a criminal record of convictions, although he has been arrested on at least two occasions, including once with a firearm and kilogram of cocaine. Public records reflect that Shaffaat's father was deported from the United States for illegal firearms trafficking. Shaffaat has told others that his father was killed back in Iran, but no body was ever found. The CI has advised that SANTOIEMMA told him/her that the father was back in the United States under

another identity. Records reflect that Shaffaat had an entire loft built above the show room, and the

CI has advised that there is a living space in there.   Undercover agents pretending to do business at

Prestige, observed in January of 2013, that the office is secured with a cypher lock.  Police databases

do reflect that an automatic rifle is stored at Prestige Annapolis.   Finally, a concerned citizen has

reported that Shaffaat carries many automatic weapons in the trunk of his car.  While your affiant

has no way to confirm or corroborate this information, it does add to the concern.  The presence of

firearms increases the likelihood of harm to both the occupants as well as law enforcement.  Persons

who collect guns do so for many reasons to include protection of their homes and businesses against

break-ins and other trespassers.  Others believe they need protection against the government.

Knowing there are multiple guns at both locations, causes your affiant to request a no knock entry

for the safety of all involved.

**Items to be recovered at the location:**  Agents expect firearms to be located and whether or

not they have been employed in furtherance of this conspiracy or not will need to be determined.

Agents also expect to find records reflecting the operation of the criminal enterprise described

herein, (both drug trafficking and money laundering) money, assets, and other documents, more

fully described in ATTACHMENT C.

12.     **2054 Tilghman Drive**
        **Crofton, Maryland 21114**

**Home of:**     Sean Chirstopher Shannon
                 DOB: 05/6/1977; white male

**Intercepted in drug related conversations:** Yes

**Criminal record of arrest/convictions:** No

**Description:**   The residence is further described as a single family residence with a
red brick bottom exterior and a grayish blue vinyl siding upper exterior. The
residence has blue shutters and a red front door. The residence has a white storm
door on the front door. The numbers "2054" are located to the right side of the front
door in white with a black background. The numbers "2054" can also be located
painted on the curb in front of the residence in black with a white background. The
residence has an attached garage on the right side of the residence (facing the
residence) at the top of a blacktop driveway. The residence has gray colored shingles
on the roof and a wood privacy fence with a gate on the right side of the residence.

**How do we know he lives there:**   This property is a rental.   Shannon has been surveilled at

his home as recently as November 30, 2012.  Outside of the home was a 2001 Silver Lexus that

Shannon has been surveilled operating on numerous occasions, and a red 2000 Ford Pick-up Truck.

At 1:00 pm, Shannon was observed leaving this location, getting into the Truck and driving away.

The Truck is registered to a "Pat Shannon."

**Additional Support to search this location:**  Shannon has been intercepted repeatedly

speaking with SANTOIEMMA in conversations that your affiant knows were Shannon distributing

marijuana to SANTOIEMMA.  For example, on September 28, 2012, SANTOIEMMA called

Shannon and asked about some "cigarettes" and that he wanted a price around thirty-five hundred.

Your affiant understand this to be a conversation about a pound of marijuana costing approximately

$3,500.  Shannon indicated that was Shannon's cost, so they agree, SANTOIEMMA could sell it for

$3,900.  Shannon indicated he had three pounds for SANTOIEMMA at that price.   On October 19,

2012, SANTOIEMMA was intercepted speaking with Ryan WHEELER, and SANTOIEMMA

asked WHEELER's help moving what your affiant believes was marijuana.[6] WHEELER was willing. SANTOIEMMA indicated that he had ordered some for his cousin who no longer wanted all of it, and WHEELER said "I'll take all of them." Approximately two hours later, WHEELER called SANTOIEMMA. SANTOIEMMA told WHEELER that he was going to meet "Sean," the "kid from Crownsville," and that he would call WHEELER after he met with him. Your affiant knows that Sean Shannon is associated with a neighborhood bar in Crownsville. On December 6, 2012, Shannon was intercept speaking with DAYI. They discussed the fact that Frederick THOMAS owed Shannon $14,000 money for drugs. Shannon was asking DAYI to help him find THOMAS. In your affiant's opinion, Shannon has become another source of marijuana for SANTOIEMMA and THOMAS in addition to DAYI and the rest of the organization. Shannon, by speaking with DAYI about THOMAS, understands the relationships between these people and works within that construct.

**Items to be recovered at the location:**   Agents expect to find records reflecting Shannon's involvement with the criminal enterprise described herein, as well as indications of his other sources and customers, money, assets, and other documents, more fully described in ATTACHMENT B.

---

[6] Prior to that call, SANTOIEMMA had made the same offer to CI-1. When CI-1 asked where it came from, SANTOIEMMA told CI-1 it was from Sean Shannon. CI-1 reported this to your affiant simultaneously as it was happening.

13.   **326 Woodleaf Court**
      **Glen Burnie, Maryland 21061**

**Home of:**   ANTHONY EVANS OWINGS SEEN
              DOB: 11/5/1986; white male

**Description:**   The residence is further described as a duplex with white vinyl siding and green shutters.  The residence has a white front door with a green trimmed glass storm door.  The numbers "326" are located above the front door in black numbers. A red and white "Beware of Dog" sign is affixed to the glass storm door.  A set of cement steps leads to the front door of the residence.

14.   **9-C Central Avenue**
      **Glen Burnie, Maryland 21060.**

**Location of:**   Let 'Em Loose Bail Bonds

**Description:** This property is further described as a small commercial strip shopping center covered in reddish brown brick.  It is a one story establishment, and above the large window on the front of the property, is a canopy facade with a white sign with green letters that says "Let 'Em Loose Bail Bonds" embedded in the facade.  Facing the property, to the left of the window is a single glass door, with green letters repeating the sign.  Above that sign on the glass door, is written "9 C."  Facing the property, to the right is a "hair studio."

**Intercepted in drug related conversations:** Yes

**Criminal record of arrest/convictions:** Two prior drug arrests - no convictions.

**How do we know he lives at Woodleaf:** SEEN has been surveilled driving a 1999 red Jeep Cherokee, which is registered in his name (and his wife's) at this **Woodleaf Court** address.  He also drives a 2000 Ford Mustang which also in both their names at this address.   The day before the first load of marijuana arriving at KRUSH, on November 15, 2012, SEEN was intercepted speaking with SEGAL.  They agreed to meet at SEGAL's house **(Hillcrest)** so SEEN could give money to SEGAL, but SEEN indicated that he had to go home first and drop of his "guns."  Agents on surveillance at **Woodleaf Court**, observed SEEN arrive in his 2000 Ford Mustang, and carry two bags, one like a gym bag, and one like a duffle bag, into his home.  The duffle bag appeared to be very heavy.  Moments later he left the house empty-handed, got into his 1999 Jeep Cherokee, and

was followed to **Hillcrest.** He went into **Hillcrest** carrying a small bag.  On January 9, 2012, at 8:05 am, agents observed the 1999 red Jeep Cherokee in SEEN's name, parked out front.  At the same time, agents observed a television that was on inside the front window.

**How do we know he works at Central:**  The website for the bail bond business reflects this address, reflects him as part owner/operator, and he has been intercepted arranging for meetings at this location.  Others, such as SEGAL and DAYI, refer to him as "Tony the Bailbondsman."

**Additional Support to search these locations and :**  SEEN is largely involved in distributing pounds of marijuana and delivering proceeds back to SEGAL and DAYI.  SEEN has been intercepted speaking with DAYI, GLICKMAN and SEGAL about marijuana distribution.  On December 3, 2012, SEEN and DAYI were intercepted speaking to each other and arranging a meeting at SEEN's Bail Bonds business at **9-C Central Avenue, Glen Burnie, Maryland 21060.** A later conversation was intercepted where SEEN was giving DAYI exact directions while DAYI was driving there.  SEEN was surveilled at KRUSH on **Preston Court** on November 16, 2012, the night the 400 pounds of marijuana was delivered.  The day after the second delivery on the night of December 11, 2012, at 4:24 pm, GLICKMAN called SEEN and asked if SEEN was coming over later so GLICKMAN could give him ten pounds.  At 6:00 pm, a Chevy Malibu arrived at **Preston Court,** and twenty minutes later, a large box (36" v 24") was carried out of KRUSH and put into the Malibu.  The Malibu was followed back to "Let 'Em Loose Bail Bonds" at **9-C Central Avenue, Glen Burnie, Maryland 21060.**  The three principals of this business, according to their website are "Tony Seen, Donny Beach and John Ryan."  The Malibu is registered to Donny Beach.  On December 26, 2012, DAYI and SEEN were talking about BERGAL coming by the office, and SEEN advised DAYI that he had $30,000 waiting for DAYI.

**Request for No Knock Entry:**  Your affiant understands that as a bailbondsman, SEEN

52

will have guns. The evidence described above reflects that he does have several of them.

Regardless of the legality of the possession of these guns, they pose a danger to the agents entering

his home and the business.   Your affiant believes this would justify a no knock warrant for the

safety of all involved.

**Items to be recovered at the location:**   At both locations, gents expect to find firearms,

drugs, records reflecting SEEN's involvement with the criminal enterprise described herein, money,

assets, and other documents, more fully described in ATTACHMENT C.

15.   **621 Genessee Street**
      **Annapolis, Maryland 21401**

**Home of:**   RYAN BURTON WHEELER
               DOB: 011/05/1980, black male

**Description:**   The residence is further described as a red brick townhouse with brown shingles. The front door is blue with gold address numbers "621" located on the top middle of door. The door opens left to right and is secured by a deadbolt on left side of door. There are two second floor windows and a large double window to the left side of the front door. There is a gold porch light on the wall to the left side of door and an ADT security sign posted in the ground also to the left. From the street curb, there are approximately six steps up to the walkway that leads to the front door. There is no access to the rear of the residence from Genessee Street. The rear of residence is approached from Harwood Place, through a wooden gate. The back of the residence has a small patio, surrounded by a wooden railing and partition. The rear door is gray, with a white storm door. There are two second floor windows in the rear, and one large window to the right of the rear door. There is a patio light to the right of the door. Taylor Avenue is a nearby cross street with Genessee.

16.   **508 Royal Street**
      **Annapolis, Maryland 21401**

**Home of:**   Lannette Wheeler, RYAN WHEELER's mother
               DOB: 2/17/1950; black female

**Description:**   The residence is further described as a light brown/tan brick townhouse with white shutters. White storm and front doors open left to right with an overhang over top the front entrance. There are three windows across second floor and two on the first floor. The address numbers are black on white to the left side of door over top a gold mailbox. The rear of residence has a six foot wooden privacy fence around the back of the property. There is a rear brick porch with windows and at least one outbuilding which appears to be a shed. Bywater Road is a nearby cross street with Royal Street.

**Intercepted in drug related conversations:**   Yes

**Criminal record of arrest/convictions:**   Yes. Six arrests: Possession of marijuana; PWID marijuana and cocaine; second degree assault; reckless endangerment with a handgun; and first degree murder with a handgun. No dispositions.

**How do we know he/she lives there:**   According to Maryland land records, Ryan

WHEELER and his mother, Lannette Wheeler own the property at **621 Genessee Street,** and

Lannette WHEELER owns the property at **508 Royal Street**.  Based upon surveillances and

intercepts, your affiant knows that Ryan WHEELER, lives at **Genessee** and also spends a great deal

of time, and stores money and drugs at his mother's house at **508 Royal Street, Annapolis,**

**Maryland 21401**.  Agents have just concluded the fourth 30 day interception on telephones used by

WHEELER.  On September 25, 2012, agents intercepted WHEELER arranging a drug deal with

others.  Agents on surveillance at **508 Royal Street,** observed WHEELER's mother, Lannette

Wheeler and Lineberry exit the house.  They went to a post office.  Then they went to a second post

office and Lannette Wheeler took a package inside.  During this time, back at **508 Royal Street,**

agents observed WHEELER arrive.  He went inside carrying a black backpack.  Approximately 15

minutes later, two unknown males arrived at **Royal Street** and were permitted entrance.  Lannette

Wheeler returned to her home, went inside, and then WHEELER and the two unknowns met with

Lineberry in the parking lot out front.  WHEELER, in his Chevy Silverado, Lineberry in his

Volkswagen, and the two unknowns in their vehicle traveled to **621 Genessee Street,** where all four

go inside.  Twenty minutes later, all four left **Genessee.**  Lineberry and WHEELER were in

Lineberry's Volkswagen, and the two unknowns followed in their vehicle. They all traveled to a

Safeway Grocery store located on Ritchie Highway at Arnold Road.  WHEELER and Lineberry left

the Safeway parking lot in the Volkswagen, and drove to **1413 Mariner Drive**, Lineberry's house,

less than a mile away.  Lineberry exited his vehicle, and walked around the side of his house

towards the rear.  One minute later, Lineberry exited his house at **Mariner** with a bag and got back

into the Volkswagen.  They returned to the Safeway parking lot, where WHEELER carried the bag,

exited his car and gave it to the two unknowns still sitting in their car.  Your affiant submits this is a

logical thing for drug dealers to do, hide one of their stash locations.  On September 30, 2012,

WHEELER called his mother, Lannette Wheeler, on her house telephone (a landline) at **Royal Street**, and said, "Hey mom, I left some money in the back seat of the car for you." Lannette Wheeler asked, "Okay, you left some money in. . . in my car?" WHEELER replied in the affirmative. Lannette Wheeler asked, "Okay, where is it in my car?" WHEELER replied, "In the back, in a bag." Lannette Wheeler indicated she would go get it and call him back. Approximately two minutes later, Lannette Wheeler called her son from her house phone at **Royal Street** and said, ". . . yea, white bag." WHEELER said, "Yea." The mother said, "Yea, I got it, I'm putting it upstairs in the safe now." At the very least, your affiant believes there are proceeds of this operation at **Royal Street**. On January 8, 2013, at approximately 5:00 pm, agents observed Lineberry (WHEELER's assistant) pull up outside of the house at **Genessee** in his Volkswagen, get out of the car, and begin to look around. Surveillance agents believed he was conducting counter-surveillance and left the area. Agents did note that parked next to the Volkswagen, was a Cadillac Escalade with temporary tags. On January 9, 2013, that Cadillac Escalade was observed at 10:00 am parked in front of **Mariner,** Lineberry's house. On January 9, 2013, at 12:20 pm, agents surveilled Lineberry leave his home at **Mariner,** get into a Cadillac Escalade with temporary tags and drive away. On January 9, 2013 at 8:15 am, agents observed Lannette Wheeler's Toyota (registered in her name) parked out front of **Royal**, as well as, a Honda with a dealer tag to Wheeler Automotive, the car business operated by WHEELER, also parked out front.

   **Additional Support to search this location:** Your affiant knows that a company started and owned by WHEELER, known as "202 Big Wheels" was used for EBay sales by WHEELER. At some point in time, DAYI began using the same PayPal Account bearing WHEELER's name for KRUSH's business. Agents have intercepted discussions about the financial arrangements between WHEELER and KRUSH principals for the use of his name. WHEELER has been intercepted in

multiple conversations involving his distributions of marijuana, cocaine, and diverted pharmaceuticals. WHEELER buys and sells used cars - purchases them at auctions and sells them locally. WHEELER also deals drugs that he obtains from DAYI and his organization, as well as supplies DAYI's organization when the need presents itself. Persons directly assisting WHEELER in drug trafficking include JEFF SMALL, ALEXANDROS Lineberry, WHEELER's girlfriend Rebekah Ramirez, his mother Lannette Wheeler, and others to include Christopher Sofield, Adam Petty, Aaron Landry, Nicolas Capurro, Wyatt Gould, and Alvin Porch.

**Request for No Knock Entry:**   As described above, WHEELER has six prior arrests starting in 2000 with a second degree assault. In 2005 and 2006, he was charged with reckless endangerment and use of a firearm; and first degree murder with a firearm, respectively. CI-1 has advised that WHEELER carries a firearm. WHEELER has been intercepted in conversations about fighting and hurting other people. Based upon the evidence described above, WHEELER is storing drugs and/or cash at Genessee and Royal. It would be reasonable to expect a firearm at these locations to protect these assets. For these reasons, agents are requesting a no-knock entry into both of these locations.

**Items to be recovered at the location:**   Agents believe there is probable cause that there is a firearm within either or both of these locations. Agents also expect to find distribution amounts of marijuana, packaging and other paraphernalia reflecting those amounts, records reflecting the operation of the criminal enterprise described herein, money, assets, and other documents, more fully described in ATTACHMENT C.

17.    **1413 Mariner Drive
       Arnold, Maryland 21012**

**Home of:**    Alexandros Lineberry
               DOB: 06/14/1976; white male

**Intercepted in drug related conversations:** Yes

**Criminal record of arrest/convictions:** Yes - 3 arrests.  One PWID marjuana and a handgun; one possession of cds.  He was convicted of both in 1998.  In 2003, an importation charge involving 45 kilograms of marijuana was dismissed.

**Description:**   The residence is further described as a single home located at the corner of Mariner Drive and Bosun Road.  It is a split foyer, with gray siding and red brick.  The front door is white, has a storm door, and opens right to left.  There are six windows across the top floor and four ground/ basement windows.  There is a driveway to left side of residence.  The rear of the residence has a deck with steps leading up from the yard.  There is a sliding door to the rear of the house accessed from the deck.  There are four windows across the rear of the residence.  While facing the front of the house, the side to the left, has a white basement door, and two second floor windows.

**How do we know he lives there:**   Based upon the intercepts, your affiant believes that WHEELER uses Lineberry's home as a stash location.  Based upon the surveillance at **Royal, Genessee,** the Safeway grocery store, and **Mariner** on September 25, 2012, your affiant believes a drug deal occurred and that the stash location for that deal was at **Mariner.**  Lineberry and his Volkswagen 2006 Volkswagen Passat has both been surveilled at **Mariner** as recently as November 12, 2012.  On January 9, 2013, at 12:20 pm, agents surveilled Lineberry leave his home at **Mariner,** get into a Cadillac Escalade with temporary tags and drive away.

**Additional Support to search this location:**  Lineberry has been intercepted in daily drug conversations with WHEELER.  On October 12, 2012, agents intercepted WHEELER discussing Lineberry in a conversation with another.  According to the discussion, when the second of two mailed packages was late arriving at Lineberry's house at **Mariner Drive,** fearing the worst, Lineberry took the first package and threw it in the woods behind his house.  Approximately five

minutes later, WHEELER called Lineberry directly to see if he was alright.  WHEELER reassured Lineberry not to worry about it, and they agreed to meet.

**Items to be recovered at the location:**   Agents expect to find drugs, records reflecting Lineberry's involvement with the criminal enterprise described herein, money, assets, and other documents, more fully described in ATTACHMENT A.

59

13-0063SAG   to  13-0079SAG

## IV. CONCLUSION.

Attached hereto following this affidavit, are the three Attachments referenced herein. In summary they are as follows:

ATTACHMENT A, lists items expected to be found within locations to include drugs, documents and records, proceeds of the illegal activity, and assets. **(Locations #1, 4, and 17.)**

ATTACHMENT B, lists items expected to be found within locations to include documents and records, proceeds of the illegal activity, and assets. **(Locations #6, 7, 8, 9 and 12.)**

ATTACHMENT C, lists items expected to be found within locations to include drugs, documents and records, proceeds of the illegal activity, and assets. Firearms are also expected to be in these locations.. For each of those locations, agents are requesting no knock entry. **(Locations #2, 3, 5, 10, 11, 13, 14, 15 and 16.)**

Based upon the evidence presented herein, your affiant believes there is evidence, more fully described herein, reflecting on going Federal Narcotics violations prohibited under, Title 21 U.S.C. § 841 *et seq*, and of Federal Money Laundering violations prohibited under Title 18 U.S.C. § 1956(h), to be located within the locations described herein.

Respectfully submitted,

Matthew Wires, Detective
Anne Arundel County Police
DEA Task Force Officer

Subscribed and sworn before me this 14th day of January, 2013.

Stephanie A. Gallagher
United States Magistrate Judge
District of Maryland

60

13-0063SAG

## ATTACHMENT A

## DESCRIPTION OF EVIDENCE TO BE SEARCHED FOR AND SEIZED

The following items, as well as the business and personal records of

KEREM DAYI,
OZLEM DAYI
KRUSH NYC, LLC
EAST COAST LIQUIDS, LLC
202 BIG WHEELS
PRESTIGE ANNAPOLIS, LLC
ROBERT RANDALL GLICKMAN,
SCOTT RUSSELL SEGAL,
GABRIEL GONZALEZ,
GOKAHN BERGEL,
STEVEN NEIL MADDEN,
MARTIN DANDY,
PATRICK RUSSO,
RYAN BURTON WHEELER,
ALEXANDROS LINEBERRY,
JEFFREY DENNIS SMALL,
ANTHONY CAESAR SANTOIEMMA,
ANTHONY EVANS OWINGS SEEN,
CHRISTOPHER JOHN GARNER,
FREDERICK BLAIR THOMAS,
SAE HYONG HWANG,
CHARLES MICHAEL THOMSON,
DONALD GOODMAN
KENNETH ENG
BRIANNA WRIGHT
PETER RIVERA

and any other business entities that are owned by or associated with the above cited parties or

entities whether stored in hard copy or computer, relating to the periods January 1, 2004 to the

present, which are fruits, instrumentalities, and evidence of violations of Title 18 U.S.C. §1956,

and Title 21 U.S.C. §§ 841, 843 and 846, including:

1.    CONTROLLED SUBSTANCES – Any and all of the following items, which are
      evidence, fruits, or instrumentalities:

      a)      Marijuana, a schedule I controlled dangerous substance.

b)      Cocaine, a schedule II controlled dangerous substance.   .

c)      Diverted Pharmaceuticals

d)      Any other suspected controlled dangerous substances.

d)      Paraphernalia for packaging, cutting, weighing, and distributing controlled and dangerous substances, including but not limited to scales, baggies, bottles, and cans.

2.      RECORDS/DOCUMENTS  The following books, records, documents or photographs, whether contained on paper in handwritten, typed, photocopied or printed form or stored on computer printouts, magnetic tape, cassette, disk, diskette, photo-optical devices, photographic film or any other medium:

a)      Any firearms registration and concealed/carry permit documents.

b)      Any documents relating to commercial storage facilities.

c)      Indicia of control of the premises that establish the persons who have control, possession, custody or dominion over the property and vehicles searched and from which evidence is seized, such as personal mail, checkbooks, personal identification, notes, other correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs, (developed and undeveloped), leases, mortgage bills, vehicle registration information or ownership warranties, or receipts for vehicle repairs.

3.      CELLULAR TELEPHONES- Either consent from the owners or separate search warrants will be obtained to open the cell phones to determine the contents therein.

4.      COMPUTERS[1] Either consent from the owners or separate search warrants will be

---

[1]      In addition, computer hardware, software, documentation, passwords, data security devices, and data, as further described below and in the affidavit incorporated by reference into this search warrant, are also to be seized . The items to be seized include any and all electronic devices that are capable of analyzing, creating, displaying, or transmitting electronic or magnetic computer impulses or data. These devices include computers, cell phones, telephones, electronic organizers, personal digital assistants (PDAs), fax machines, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer-related electronic devices. The items to be seized include any and all instructions or programs stored in the form of electronic or magnetic media that are capable of being interpreted by computer or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters, and other programs or software used to

2

obtained to search the computers to determine the contents therein.

5.      OTHER ITEMS- The following miscellaneous items to include:

     a)     United States Currency, and financial instruments, including stocks and bonds gained as a result of any illegal activities outlined in the attached affidavit.

     b)     Any and all safes, locked boxes and receptacles and to seize all contents that pertain to said illegal activities.

6.      Tax records, including retained copies of federal, state, and local corporate, partnership, business, personal, and sales and use tax returns, filed or not filed, and supporting notes, work papers, summary sheets and analyses used in preparation of    the tax returns; and tax forms, including Forms W-2; Forms 1099; and Forms 1098;

7.      Financial records including:

     a)     Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes, and work papers;

     b)     All correspondence, letters, memoranda, applications, powers of attorney, and listings, which contain financial information, such as income, expenses, assets, liabilities, transfer of money, clients, or accounts;

     c)     Bank or financial institution records and other records, including bank statements, passbooks, deposit slips, deposited items, withdrawal slips, cancelled checks, bank receipts, bank checks, money order receipts, wire transfers, credit and debit memos, and safe deposit keys and records;

     d)     Bank and financial institution records and other records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency;

     e)     Records of purchase and sale of assets and investments including stocks and other

---

communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission. The items to be seized include any and all written or printed material that provides instructions or examples concerning the operation of a computer system, computer software and/or any related device. The items to be seized include any and all information and/or data stored in the form of magnetic or electronic coding on computer-related equipment. This media includes, but is not limited to, floppy disks, diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, and any other media which is capable of storing magnetic code.

securities, including statements and receipts;

f)   Records of real estate transaction, including contracts, agreements, settlement sheets payments and receipts of money;

g)   Records of loans or letters of credit including contracts, mortgages, notes, agreements, applications, payments, and financial statements;

h)   Credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

i)   Records of purchase and/or financing of assets including statements, receipts, and payment records;

j)   Records of expenditures including payments, receipts, invoices, statements, photographs, and other evidence of the expense;

k)   Records of income from any source including income from accounting and real estate sales, including fees and schedules, records of fees charged, copies of checks and deposit slips;

l)   Records indicating the purchase, lease, rental, possession, or maintaining of equipment, real estate, vehicles, capital assets and any other assets;

m)   Records of personal and living expenses including bills, invoices, payments, receipts, invoices, statements, photographs, passports, airline tickets, records of travel, and other evidence of the expense;

8.   Employment records and personnel files including employees lists, names, addresses, and duties of employees, applications, Forms W-2, 1099, W-4, employment tax returns, ledgers, payroll journals, payroll records and correspondence;

9.   Insurance records;

10.   Storage facility records and keys;

11.   Records of forming and operating corporations, partnerships, trusts, limited liability companies, associations, businesses, and any other entities, along with contacts agreements, articles of incorporation or formation, minutes of meetings of the board of directors, officers, partners, or members, and partnership agreements and business filings;

12.   Address books, telephone books, rolodex indices, lists, any papers reflecting names,

4

13-0063SAG

addresses, telephone numbers, pagers numbers, fax numbers, e-mail addresses, and web sites of possible clients, customers, creditors, financial institutions, and other individuals or businesses with whom a financial relationship exists;

The above paragraphs 1 through 12 (including subparagraphs), inclusive, include all of the foregoing items of evidence in whatever form and by whatever means such materials, their drafts, or their modifications may have been created or stored, including, any handmade form (such as writing); any photocopies; any mechanical form (such as printing, or typing); any electrical, electronic, or magnetic form or data (such as any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-ROMs, or printer buffers, as well as printouts or readouts from any magnetic storage device).

5

13-0063SAG

## ATTACHMENT B

## DESCRIPTION OF EVIDENCE TO BE SEARCHED FOR AND SEIZED

The following items, as well as the business and personal records of

KEREM DAYI,
OZLEM DAYI
KRUSH NYC, LLC
EAST COAST LIQUIDS, LLC
202 BIG WHEELS
PRESTIGE ANNAPOLIS, LLC
ROBERT RANDALL GLICKMAN,
SCOTT RUSSELL SEGAL,
GABRIEL GONZALEZ,
GOKAHN BERGEL,
STEVEN NEIL MADDEN,
MARTIN DANDY,
PATRICK RUSSO,
RYAN BURTON WHEELER,
ALEXANDROS LINEBERRY,
JEFFREY DENNIS SMALL,
ANTHONY CAESAR SANTOIEMMA,
ANTHONY EVANS OWINGS SEEN,
CHRISTOPHER JOHN GARNER,
FREDERICK BLAIR THOMAS,
SAE HYONG HWANG,
CHARLES MICHAEL THOMSON,
DONALD GOODMAN
KENNETH ENG
BRIANNA WRIGHT
PETER RIVERA

and any other business entities that are owned by or associated with the above cited parties or

entities whether stored in hard copy or computer, relating to the periods January 1, 2004 to the

present, which are fruits, instrumentalities, and evidence of violations of Title 18 U.S.C. §1956,

and Title 21 U.S.C. §§ 841, 843 and 846, including:

1.     RECORDS/DOCUMENTS  The following books, records, documents or photographs,
       whether contained on paper in handwritten, typed, photocopied or printed form or stored
       on computer printouts, magnetic tape, cassette, disk, diskette, photo-optical devices,
       photographic film or any other medium:

a)   Any firearms registration and concealed/carry permit documents.

b)   Any documents relating to commercial storage facilities.

c)   Indicia of control of the premises that establish the persons who have control, possession, custody or dominion over the property and vehicles searched and from which evidence is seized, such as personal mail, checkbooks, personal identification, notes, other correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs, (developed and undeveloped), leases, mortgage bills, vehicle registration information or ownership warranties, or receipts for vehicle repairs.

2.   CELLULAR TELEPHONES- Either consent from the owners or separate search warrants will be obtained to open the cell phones to determine the contents therein.

3.   COMPUTERS[1] Either consent from the owners or separate search warrants will be obtained to search the computers to determine the contents therein.

4.   OTHER ITEMS- The following miscellaneous items to include:

a)   United States Currency, and financial instruments, including stocks and bonds gained as a result of any illegal activities outlined in the attached affidavit.

---

[1]   In addition, computer hardware, software, documentation, passwords, data security devices, and data, as further described below and in the affidavit incorporated by reference into this search warrant, are also to be seized . The items to be seized include any and all electronic devices that are capable of analyzing, creating, displaying, or transmitting electronic or magnetic computer impulses or data.  These devices include computers, cell phones, telephones, electronic organizers, personal digital assistants (PDAs), fax machines, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer-related electronic devices.  The items to be seized include any and all instructions or programs stored in the form of electronic or magnetic media that are capable of being interpreted by computer or related components.  The items to be seized include operating systems, application software, utility programs, compilers, interpreters, and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission.  The items to be seized include any and all written or printed material that provides instructions or examples concerning the operation of a computer system, computer software and/or any related device.  The items to be seized include any and all information and/or data stored in the form of magnetic or electronic coding on computer-related equipment.  This media includes, but is not limited to, floppy disks, diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, and any other media which is capable of storing magnetic code.

2

b)      Any and all safes, locked boxes and receptacles and to seize all contents that
        pertain to said illegal activities.

5.      Tax records, including retained copies of federal, state, and local corporate,
        partnership, business, personal, and sales and use tax returns, filed or not filed, and
        supporting notes, work papers, summary sheets and analyses used in preparation of    the
        tax returns; and tax forms, including Forms W-2; Forms 1099; and Forms 1098;

6.      Financial records including:

a)      Books, records, ledgers, journals, statements, receipts, invoices, billings, financial
        statements, balance sheets, notes, and work papers;

b)      All correspondence, letters, memoranda, applications, powers of attorney, and
        listings, which contain financial information, such as income, expenses, assets,
        liabilities, transfer of money, clients, or accounts;

c)      Bank or financial institution records and other records, including bank statements,
        passbooks, deposit slips, deposited items, withdrawal slips, cancelled checks,
        bank receipts, bank checks, money order receipts, wire transfers, credit and debit
        memos, and safe deposit keys and records;

d)      Bank and financial institution records and other records, showing acquisition,
        conversion, movement, secreting, transfer and disbursement of United States and
        foreign currency;

e)      Records of purchase and sale of assets and investments including stocks and other
        securities, including statements and receipts;

f)      Records of real estate transaction, including contracts, agreements, settlement
        sheets payments and receipts of money;

g)      Records of loans or letters of credit including contracts, mortgages, notes,
        agreements, applications, payments, and financial statements;

h)      Credit and debit card records, including records of purchases, withdrawals,
        deposits and cash advances made with credit and debit cards, and including
        statements and receipts;

i)      Records of purchase and/or financing of assets including statements, receipts, and
        payment records;

j)      Records of expenditures including payments, receipts, invoices, statements,

3

photographs, and other evidence of the expense;

k)   Records of income from any source including income from accounting and real
     estate sales, including fees and schedules, records of fees charged, copies of
     checks and deposit slips;

l)   Records indicating the purchase, lease, rental, possession, or maintaining of
     equipment, real estate, vehicles, capital assets and any other assets;

m)   Records of personal and living expenses including bills, invoices, payments,
     receipts, invoices, statements, photographs, passports, airline tickets, records of
     travel, and other evidence of the expense;

7.   Employment records and personnel files including employees lists, names, addresses, and
     duties of employees, applications, Forms W-2, 1099, W-4, employment tax returns,
     ledgers, payroll journals, payroll records and correspondence;

8.   Insurance records;

9.   Storage facility records and keys;

10.  Records of forming and operating corporations, partnerships, trusts, limited liability
     companies, associations, businesses, and any other entities, along with contacts
     agreements, articles of incorporation or formation, minutes of meetings of the board of
     directors, officers, partners, or members, and partnership agreements and business filings;

11.  Address books, telephone books, rolodex indices, lists, any papers reflecting names,
     addresses, telephone numbers, pagers numbers, fax numbers, e-mail addresses, and web
     sites of possible clients, customers, creditors, financial institutions, and other individuals
     or businesses with whom a financial relationship exists;

The above paragraphs 1 through 11 (including subparagraphs), inclusive, include all of

the foregoing items of evidence in whatever form and by whatever means such materials, their

drafts, or their modifications may have been created or stored, including, any handmade form

(such as writing); any photocopies; any mechanical form (such as printing, or typing); any

electrical, electronic, or magnetic form or data (such as any information on an electronic or

4

13-0063SAG

magnetic storage device, such as floppy diskettes, hard disks, CD-ROMs, or printer buffers, as well as printouts or readouts from any magnetic storage device).

## ATTACHMENT C

## DESCRIPTION OF EVIDENCE TO BE SEARCHED FOR AND SEIZED

The following items, as well as the business and personal records of

KEREM DAYI,
OZLEM DAYI
KRUSH NYC, LLC
EAST COAST LIQUIDS, LLC
202 BIG WHEELS
PRESTIGE ANNAPOLIS, LLC
ROBERT RANDALL GLICKMAN,
SCOTT RUSSELL SEGAL,
GABRIEL GONZALEZ,
GOKAHN BERGEL,
STEVEN NEIL MADDEN,
MARTIN DANDY,
PATRICK RUSSO,
RYAN BURTON WHEELER,
ALEXANDROS LINEBERRY,
JEFFREY DENNIS SMALL,
ANTHONY CAESAR SANTOIEMMA,
ANTHONY EVANS OWINGS SEEN,
CHRISTOPHER JOHN GARNER,
FREDERICK BLAIR THOMAS,
SAE HYONG HWANG,
CHARLES MICHAEL THOMSON,
DONALD GOODMAN
KENNETH ENG
BRIANNA WRIGHT
PETER RIVERA

and any other business entities that are owned by or associated with the above cited parties or

entities whether stored in hard copy or computer, relating to the periods January 1, 2004 to the

present, which are fruits, instrumentalities, and evidence of violations of Title 18 U.S.C. §1956,

and Title 21 U.S.C. §§ 841, 843 and 846, including:

1.     FIREARMS -- Any and all of the following items, which are evidence, fruits, or
       instrumentalities:

       a)     Any firearms and other items which pertain to the possession of firearms,

including gun cases, ammunition, ammunition magazines, holsters, spare parts for firearms, firearms cleaning equipment, photographs of firearms or of persons in possession of firearms, and receipts for the purchase and/or repair of all these items;

2.   CONTROLLED SUBSTANCES – Any and all of the following items, which are evidence, fruits, or instrumentalities:

   a)   Marijuana, a schedule I controlled dangerous substance.

   b)   Cocaine, a schedule II controlled dangerous substance.

   c)   Diverted Pharmaceuticals

   d)   Any other suspected controlled dangerous substances.

   e)   Paraphernalia for packaging, cutting, weighing, and distributing controlled and dangerous substances, including but not limited to scales, baggies, bottles, and cans.

3.   RECORDS/DOCUMENTS  The following books, records, documents or photographs, whether contained on paper in handwritten, typed, photocopied or printed form or stored on computer printouts, magnetic tape, cassette, disk, diskette, photo-optical devices, photographic film or any other medium:

   a)   Any firearms registration and concealed/carry permit documents.

   b)   Any documents relating to commercial storage facilities.

   c)   Indicia of control of the premises that establish the persons who have control, possession, custody or dominion over the property and vehicles searched and from which evidence is seized, such as personal mail, checkbooks, personal identification, notes, other correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs, (developed and undeveloped), leases, mortgage bills, vehicle registration information or ownership warranties, or receipts for vehicle repairs.

4.   CELLULAR TELEPHONES- Either consent from the owners or separate search warrants will be obtained to open the cell phones to determine the contents therein.

2

5.    COMPUTERS[1] Either consent from the owners or separate search warrants will be
      obtained to search the computers to determine the contents therein.

6.    OTHER ITEMS- The following miscellaneous items to include:

      a)    United States Currency, and financial instruments, including stocks and bonds
            gained as a result of any illegal activities outlined in the attached affidavit.

      b)    Any and all safes, locked boxes and receptacles and to seize all contents that
            pertain to said illegal activities.

7.    Tax records, including retained copies of federal, state, and local corporate,
      partnership, business, personal, and sales and use tax returns, filed or not filed, and
      supporting notes, work papers, summary sheets and analyses used in preparation of    the
      tax returns; and tax forms, including Forms W-2; Forms 1099; and Forms 1098;

---

[1]        In addition, computer hardware, software, documentation, passwords, data
security devices, and data, as further described below and in the affidavit incorporated by
reference into this search warrant, are also to be seized . The items to be seized include any and
all electronic devices that are capable of analyzing, creating, displaying, or transmitting
electronic or magnetic computer impulses or data.  These devices include computers, cell phones,
telephones, electronic organizers, personal digital assistants (PDAs), fax machines, computer
components, computer peripherals, word processing equipment, modems, monitors, printers,
plotters, encryption circuit boards, optical scanners, external hard drives, and other computer-
related electronic devices.  The items to be seized include any and all instructions or programs
stored in the form of electronic or magnetic media that are capable of being interpreted by
computer or related components.  The items to be seized include operating systems, application
software, utility programs, compilers, interpreters, and other programs or software used to
communicate with computer hardware or peripherals either directly or indirectly via telephone
lines, radio, or other means of transmission.  The items to be seized include any and all written or
printed material that provides instructions or examples concerning the operation of a computer
system, computer software and/or any related device.  The items to be seized include any and all
information and/or data stored in the form of magnetic or electronic coding on computer-related
equipment.  This media includes, but is not limited to, floppy disks, diskettes, fixed hard disks,
removable hard disk cartridges, tapes, laser disks, video cassettes, and any other media which is
capable of storing magnetic code.

3

8. Financial records including:

   a) Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes, and work papers;

   b) All correspondence, letters, memoranda, applications, powers of attorney, and listings, which contain financial information, such as income, expenses, assets, liabilities, transfer of money, clients, or accounts;

   c) Bank or financial institution records and other records, including bank statements, passbooks, deposit slips, deposited items, withdrawal slips, cancelled checks, bank receipts, bank checks, money order receipts, wire transfers, credit and debit memos, and safe deposit keys and records;

   d) Bank and financial institution records and other records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency;

   e) Records of purchase and sale of assets and investments including stocks and other securities, including statements and receipts;

   f) Records of real estate transaction, including contracts, agreements, settlement sheets payments and receipts of money;

   g) Records of loans or letters of credit including contracts, mortgages, notes, agreements, applications, payments, and financial statements;

   h) Credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

   i) Records of purchase and/or financing of assets including statements, receipts, and payment records;

   j) Records of expenditures including payments, receipts, invoices, statements, photographs, and other evidence of the expense;

4

     k)     Records of income from any source including income from accounting and real estate sales, including fees and schedules, records of fees charged, copies of checks and deposit slips;

     l)     Records indicating the purchase, lease, rental, possession, or maintaining of equipment, real estate, vehicles, capital assets and any other assets;

     m)     Records of personal and living expenses including bills, invoices, payments, receipts, invoices, statements, photographs, passports, airline tickets, records of travel, and other evidence of the expense;

9.     Employment records and personnel files including employees lists, names, addresses, and duties of employees, applications, Forms W-2, 1099, W-4, employment tax returns, ledgers, payroll journals, payroll records and correspondence;

10.     Insurance records;

11.     Storage facility records and keys;

12.     Records of forming and operating corporations, partnerships, trusts, limited liability companies, associations, businesses, and any other entities, along with contacts agreements, articles of incorporation or formation, minutes of meetings of the board of directors, officers, partners, or members, and partnership agreements and business filings;

13.     Address books, telephone books, rolodex indices, lists, any papers reflecting names, addresses, telephone numbers, pagers numbers, fax numbers, e-mail addresses, and web sites of possible clients, customers, creditors, financial institutions, and other individuals or businesses with whom a financial relationship exists;

The above paragraphs 1 through 13 (including subparagraphs), inclusive, include all of the foregoing items of evidence in whatever form and by whatever means such materials, their drafts, or their modifications may have been created or stored, including, any handmade form (such as writing); any photocopies; any mechanical form (such as printing, or typing); any electrical, electronic, or magnetic form or data (such as any information on an electronic or

5

13-0063SAG

magnetic storage device, such as floppy diskettes, hard disks, CD-ROMs, or printer buffers, as well as printouts or readouts from any magnetic storage device).

6